**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LESLEY SAVAGE, Derivatively on Behalf of THE CHEMOURS COMPANY, ) ) | Civil Action No. 1:20-cv- |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| MARK P. VERGNANO, MARK E. NEWMAN, RICHARD H. BROWN, CURTIS V. ANASTASIO, BRADLEY J. BELL, MARY B. CRANSTON, CURTIS J. CRAWFORD, DAWN L. FARRELL, SEAN D. KEOHANE, ERIN N. KANE, and STEPHEN D. NEWLIN, ) ) ) ) ) ) ) | |
| ) | |
| Defendants, ) | |
| ) | |
| -and- ) | |
| ) | |
| THE CHEMOURS COMPANY, a Delaware Corporation, ) ) | |
| ) | |
| Nominal Defendant. ) ) | DEMAND FOR JURY TRIAL |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

Plaintiff, by her attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## <u>NATURE AND SUMMARY OF THE ACTION</u>

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant The Chemours Company ("Chemours" or the "Company") against certain of its officers and directors for violations of securities law, breach of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to Chemours' reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed Chemours to billions of dollars in potential liability for violations of state and federal law.

2.      Chemours is a chemical manufacturer that produces a wide range of industrial and specialty chemical products for various markets.  Chemours manufactures perfluoroalkyl and polyfluoroalkyl substances ("PFAS"), which are durable, chemical compounds found in common household products, including nonstick cookware such as Teflon™, water repellants, and coated papers.  PFAS are highly toxic substances known as "forever chemicals" because they build up in the blood of those who ingest PFAS contaminated water or air.

3.      Chemours was created in 2015 as a spin-off of the "Performance Chemicals" division of E.I. du Pont de Nemours and Company ("DuPont").  DuPont's Performance Chemicals division had a long history of discharging toxic PFAS into groundwater drinking supplies near its chemical plants.  DuPont has known about the significant harms caused by PFAS since at least the 1950s.  The public, however, has only recently discovered the harmful effects of PFAS as a result of mounting litigation against DuPont that uncovered internal studies linking PFAS exposure with serious health conditions, including deadly cancers.  Facing massive potential environmental liabilities, DuPont devised a plan to unload its liabilities by spinning off

the Performance Chemicals division into a separate company that would ultimately become Chemours. The Chemours spin-off took effect on July 1, 2015.

4. In connection with the spin-off, Chemours signed a Separation Agreement, under which it assumed two-thirds of DuPont's environmental liabilities and 90% of DuPont's pending environmental litigation by case volume. Due to the sheer volume of the inherited environmental liabilities, the Company soon began to experience significant headwinds, causing its stock price to fall from a target price of $21 per share to over $3 per share just months after the spin-off. Soon thereafter, the Company embarked on a campaign to assure the market that its liabilities were limited and fully under control.

5. The Company implemented a "Five-Point Transformation Plan" that would purportedly "transform" its balance sheet because, as Chemours' Chief Executive Officer ("CEO"), defendant Mark P. Vergnano ("Vergnano"), later admitted, "investors were worried if we were going to be solvent—were we going to make it through this or not?" Indeed, during Chemours' very first earnings conference call, the Company's executives assured investors that its leadership, which consisted almost entirely of longtime DuPont veterans, had been "monitoring these liabilities for many years," and that it was "important" for investors to know that those liabilities were "well understood and well managed." Chemours continued to reassure investors by both quantifying its environmental liabilities through accruals (an accounting practice that quantifies probable and estimable liabilities), and by disclosing that "potential liability may range up to" certain specified and regularly updated maximum amounts above the accruals.

6. Beginning in February 2017, the Individual Defendants (as defined herein) repeatedly and publicly stated that, with respect to its reported maximum liability ranges, there

was only a "remote" chance that its liabilities would exceed its accruals "up to" the specified maximum amounts.  The Individual Defendants further touted the purported success of the Five-Point Transformation Plan, proclaiming that Chemours in "no way" had been "set up to fail," and that its "strong" balance sheet that sparked a turnaround was "nothing short of remarkable." Analysts responded positively to these representations, concluding that the Company had "reduced its risk portfolio" and "reduced litigation risk" because its "balance sheet [and] liabilities [were] cleaned up."

7.     Unbeknownst to investors and the general public, however, the Individual Defendants' representations about the Company's balance sheet, its control over the environmental liabilities, and its reduced risk portfolio were misleading.  In truth, at the time of its spin-off, Chemours inherited massive liabilities from DuPont that rendered it insolvent from the start.  In fact, in May 2019, Chemours filed a Verified Complaint under seal against DuPont in Delaware Chancery Court in which it stated that, prior to the spin-off, DuPont engaged in a "sham" process of deliberately certifying "systematically and spectacularly wrong" maximum estimates for each of Chemours' inherited liabilities.  Notably, Chemours' complaint identified approximately $2.5 billion in imminent environmental liabilities, almost eight times the Company's $313 million accruals since February 2017.  By the Company's own account, this $2.5 billion figure was a conservative estimate "nowhere near the maximum."  According to Chemours, these liabilities were "staggering[]," and rather than remote, virtually inevitable.  As Chemours admitted, "as of the date of the spin, Chemours was insolvent."

8.     Further, Chemours admits in its sworn pleadings that its own leadership, including the same individuals who directly operated the sites inherited from DuPont, was fully aware of the Company's massive, undisclosed environmental liabilities.   The Company's

leadership knew from inception that DuPont's estimated maximums for the inherited liabilities were "baseless concoction[s]" and that, in truth, these liabilities rendered Chemours legally "insolvent." Despite their knowledge, the Individual Defendants did nothing to properly account for Chemours' environmental liabilities.

9.     In the midst of this wrongdoing, defendants Vergnano, Richard H. Brown ("Brown"), Curtis V. Anastasio ("Anastasio"), Bradley J. Bell ("Bell"), Mary B. Cranston ("Cranston"), Curtis J. Crawford ("Crawford"), Dawn L. Farrell ("Farrell"), and Sean D. Keohane ("Keohane") negligently made false and misleading statements in the Company's 2019 Proxy Statement on Form DEF14A (the "2019 Proxy") filed with the SEC on March 14, 2019. The 2019 Proxy was filed ahead of the Company's Annual Meeting of Shareholders. The 2019 Proxy included a proposal to reelect defendants Vergnano, Brown, Anastasio, Bell, Cranston, Crawford, Farrell, and Keohane to the Chemours Board of Directors (the "Board"). In connection with these defendants' efforts to reelect themselves to the Board, they asserted that they were engaged in risk oversight and that the Board's Audit Committee exercised oversight of the Company's financial statements. In addition, the 2019 Proxy included a stockholder proposal demanding a review by the Board, to be issued to stockholders, of the Company's suspicious executive compensation. Defendants Vergnano, Brown, Anastasio, Bell, Cranston, Crawford, Farrell, and Keohane asserted that this measure was unnecessary and not in the best interest of stockholders. In connection with their efforts to dissuade stockholders to vote for the executive compensation review, the above members of the Board issued false and misleading statements concerning the reported financials that omitted the Company's true environmental liabilities.

10.     The truth about the Individual Defendants' risk oversight failures and Chemours' substantial environmental liabilities and risk exposure began to emerge on May 6, 2019, when

one prominent hedge fund manager presented detailed research showing that Chemours' liabilities were significantly greater than what the Company reported. On this news, Chemours' market capitalization dropped $2.57 per share on May 6, 2019, to close at $31.61 per share compared to the previous trading day's closing of $34.18 per share, erasing more than $421 million in market capitalization in a single trading day. Just one week later, Chemours filed its Verified Complaint against DuPont under seal in which it admitted its "staggeringly" inherited liabilities had rendered it insolvent at the time of the spin-off. The Delaware Chancery Court ordered the complaint to be unsealed on June 28, 2019. In the wake of these admissions, Chemours' market capitalization fell another $3.73 per share on July 2, 2019, to close at $21.17 per share compared to the previous trading day's closing of $24.90 per share, erasing more than $611 million, or nearly 15%, in market capitalization.

11.     Finally, on August 1, 2019, Chemours issued a press release announcing a significant and unexpected increase in its environmental liabilities, coupled with a substantial reduction in free cash flow guidance. On this news, Chemours' market capitalization plummeted another $3.47 per share on August 2, 2019, to close at $14.69 per share compared to the previous trading day's closing of $18.16 per share, erasing another $567 million, or 19%, in market capitalization.

12.     In addition to the significant market capitalization loss, the Company has been harmed as a result of the Director Defendants' (as defined herein) actions in causing the Company to repurchase over $1 billion in shares of Chemours stock at artificially inflated prices while concealing from the public that Chemours' financial results were inflated by the massively understated environmental liability accruals.

13.     While the Company was harmed by the Individual Defendants' wrongful conduct, certain of the defendants fared much better.  In particular, defendants Vergnano and Mark E. Newman ("Newman") sold Chemours stock at artificially inflated prices based on their knowledge of material, nonpublic information.  In total, these insiders disposed of almost $17 million worth of their personally held Chemours stock.

14.     Further, as a direct result of this unlawful course of conduct, Chemours is now the subject of a consolidated federal securities class action lawsuit filed in the U.S. District Court for the District of Delaware on behalf of investors who purchased Chemours stock.

## JURISDICTION AND VENUE

15.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

16.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Chemours is incorporated in this District; (ii) Chemours maintains its principal place of business in this District; (ii) the Board has selected this jurisdiction for derivative cases in the Company's forum Bylaws; and (iii) defendants have received substantial compensation in this

District by doing business here and engaging in numerous activities that had an effect in this District.

## **THE PARTIES**

**Plaintiff**

18.    Plaintiff Lesley Savage was a stockholder of Chemours at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Chemours stockholder.

**Nominal Defendant**

19.    Nominal defendant Chemours is a Delaware corporation with principal executive offices located at 1007 Market Street, Wilmington, Delaware.   Chemours is a provider of industrial and specialty chemicals products for markets including plastics and coatings, refrigeration and air conditioning, general industrial, electronics, mining, and oil refining. Chemours operates through three main segments: Fluoroproducts, Chemical Solutions, and Titanium Technologies.   As of December 31, 2019, Chemours had approximately 7,000 employees.

**Defendants**

20.    Defendant Vergnano is Chemours' President, CEO, and a director has been since July 2015.  Defendant Vergnano knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's true environmental liabilities exposure.  Defendant Vergnano also breached his fiduciary duties and violated section 10(b) of the Exchange Act by causing Chemours to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.  While in possession of material, nonpublic information concerning Chemours' true

business health, defendant Vergnano sold 200,151 shares of his stock for $10,101,600.18 in proceeds. Chemours paid defendant Vergnano the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan | Change in Pension Value and Nonqualified and Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|--------------|---------------|---------------------------|------------------------------------------------------------------------------|------------------------|-------|
| 2019 | $1,029,808 | $4,273,767 | $2,239,992 | - | - | $152,077 | $7,695,644 |
| 2018 | $1,041,667 | $3,559,120 | $2,199,980 | $1,000,545 | - | $275,417 | $8,076,729 |
| 2017 | $983,333 | $3,787,623 | $2,199,989 | $2,600,000 | $141,163 | $232,063 | $9,944,171 |

21.    Defendant Newman is Chemours' Senior Vice President and has been since November 2014 and Chief Operating Officer and has been since June 2019. Defendant Newman was Chemours' Chief Financial Officer ("CFO") from November 2014 to June 2019. Defendant Newman knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's true environmental liabilities exposure. Defendant Newman also breached his fiduciary duties and violated section 10(b) of the Exchange Act by causing Chemours to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions. While in possession of material, nonpublic information concerning Chemours' true business health, defendant Newman sold 155,047 shares of his stock for $6,803,519.74 in proceeds. Chemours paid defendant Newman the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan | All Other Compensation | Total |
|------|--------|--------------|---------------|---------------------------|------------------------|-------|
| 2019 | $649,290 | $1,296,199 | $719,982 | - | $85,347 | $2,750,818 |
| 2018 | $591,220 | $776,569 | $479,986 | $346,691 | $100,591 | $2,295,057 |
| 2017 | $588,350 | $826,409 | $479,996 | $945,952 | $102,879 | $2,943,586 |

22.    Defendant Brown is Chemours' Chairman of the Board and a director and has been since July 2015. Defendant Brown also served on DuPont's board of directors from 2001 to

2015.  Defendant Brown knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Chemours to make improper statements concerning the Company's true environmental liabilities exposure.  Defendant Brown also breached his fiduciary duties and violated section 10(b) of the Exchange Act by causing Chemours to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.  Chemours paid defendant Brown the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $210,000 | $145,000 | $355,000 |
| 2018 | $210,000 | $130,045 | $340,045 |
| 2017 | $210,000 | $130,040 | $340,040 |

23.     Defendant Anastasio is a Chemours director and has been since July 2015.  Defendant Anastasio is a member of the Audit Committee and has been since at least March 2016.  Defendant Anastasio knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Chemours to make improper statements concerning the Company's true environmental liabilities exposure.  Defendant Anastasio also breached his fiduciary duties and violated section 10(b) of the Exchange Act by causing Chemours to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.  Chemours paid defendant Anastasio the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $100,000 | $145,000 | $245,000 |
| 2018 | $100,000 | $130,045 | $230,045 |
| 2017 | $100,000 | $130,040 | $230,040 |

24.     Defendant Bell is a Chemours director and has been since July 2015.  Defendant Bell is Chairman and a member of the Audit Committee and has been since at least March 2016.  Defendant Bell knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Chemours to make improper statements concerning the Company's true environmental

liabilities exposure.  Defendant Bell also breached his fiduciary duties and violated section 10(b) of the Exchange Act by causing Chemours to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.  Chemours paid defendant Bell the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $120,000 | $145,000 | $265,000 |
| 2018 | $120,000 | $130,045 | $250,045 |
| 2017 | $120,000 | $130,040 | $250,040 |

25.     Defendant Cranston is a Chemours director and has been since July 2015. Defendant Cranston is a member of the Audit Committee and has been since at least March 2016.  Defendant Cranston knowingly, in bad faith, or in conscious disregard for her  duties caused or allowed Chemours to make improper statements concerning the Company's true environmental liabilities exposure.  Defendant Cranston also breached her fiduciary duties and violated section 10(b) of the Exchange Act by causing Chemours to repurchase its stock on the open market at prices she knew were artificially inflated by her misleading statements and omissions.  Chemours paid defendant Cranston the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $115,000 | $145,000 | $260,000 |
| 2018 | $107,500 | $130,045 | $237,545 |
| 2017 | $100,000 | $130,040 | $230,040 |

26.     Defendant Crawford is a Chemours director and has been since July 2015. Defendant Crawford is a member of the Audit Committee and has been since at least March 2016.  Defendant Crawford also served on DuPont's board of directors from 1998 to 2015. Defendant Crawford knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Chemours to make improper statements concerning the Company's true environmental liabilities exposure.  Defendant Crawford also breached his fiduciary duties and violated section

10(b) of the Exchange Act by causing Chemours to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions. Chemours paid defendant Crawford the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $115,000 | $145,000 | $260,000 |
| 2018 | $115,000 | $130,045 | $245,045 |
| 2017 | $115,000 | $130,040 | $245,040 |

27.     Defendant Farrell is a Chemours director and has been since July 2015. Defendant Farrell knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Chemours to make improper statements concerning the Company's true environmental liabilities exposure. Defendant Farrell also breached her fiduciary duties and violated section 10(b) of the Exchange Act by causing Chemours to repurchase its stock on the open market at prices she knew were artificially inflated by her misleading statements and omissions. Chemours paid defendant Farrell the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $100,000 | $145,000 | $245,000 |
| 2018 | $100,000 | $130,045 | $230,045 |
| 2017 | $100,000 | $130,040 | $230,040 |

28.     Defendant Keohane is a Chemours director and has been since May 2018. Defendant Keohane knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Chemours to make improper statements concerning the Company's true environmental liabilities exposure. Defendant Keohane also breached his fiduciary duties and violated section 10(b) of the Exchange Act by causing Chemours to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions. Chemours paid defendant Keohane the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $100,000 | $145,000 | $245,000 |
| 2018 | $75,000 | $130,045 | $205,045 |

29.     Defendant Erin N. Kane ("Kane") is a Chemours director and has been since June 2019.  Defendant Kane is a member of the Audit Committee and has been since July 2019. Defendant Kane knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Chemours to make improper statements concerning the Company's true environmental liabilities exposure.  Defendant Kane also breached her fiduciary duties and violated section 10(b) of the Exchange Act by causing Chemours to repurchase its stock on the open market at prices she knew were artificially inflated by her misleading statements and omissions.  Chemours paid defendant Kane the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $50,000 | $145,000 | $195,000 |

30.     Defendant Stephen D. Newlin ("Newlin") was a Chemours director from July 2015 to May 2018.  Defendant Newlin knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Chemours to make improper statements concerning the Company's true environmental liabilities exposure.  Defendant Newlin also breached his fiduciary duties and violated section 10(b) of the Exchange Act by causing Chemours to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.  Chemours paid defendant Newlin the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $57,500 | $0 | $57,500 |
| 2017 | $115,000 | $130,040 | $245,040 |

31.     The defendants identified in ¶¶20-21 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶20, 22-30 are referred to herein as the "Director

Defendants."   The defendants identified in ¶¶23-26 are referred to herein as the "Audit Committee Defendants."   The defendants identified in ¶¶20-21 are referred to herein as the "Insider Selling Defendants."   Collectively, the defendants identified in ¶¶20-30 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

32.   By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Chemours and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Chemours in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Chemours and not in furtherance of their personal interest or benefit.

33.   To discharge their duties, the officers and directors of Chemours were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.   By virtue of such duties, the officers and directors of Chemours were required to, among other things:

(a)   properly and accurately guide stockholders and analysts as to the true business practices, operations, financials, financial prospects, compliance policies, and internal controls of the Company at any given time, including making accurate statements about the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls;

(b)   refrain from selling Chemours stock on the basis of nonpublic insider information;

(c)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority, and disseminating truthful and accurate statements to the investing public;

(d)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(e)     remain informed as to how Chemours conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

34.     Chemours holds its fiduciaries to specific corporate governance principles beyond the requirements of law.  In particular, in the Company's Corporate Governance Guidelines, Chemours describes the duties to be undertaken by the Board and the active oversight role the Board plays in the Company's business affairs.  In particular, the Corporate Governance Guidelines state:

> [T]he Board has specific functions, in addition to the oversight of management in the operation of the Company and the Company's business performance, including providing input and perspective in evaluating alternative strategic initiatives; reviewing and, where appropriate, approving fundamental financial and business strategies and major corporate actions; ensuring processes are in place to maintain the integrity of the Company; overseeing risks that could affect the Company's long-term value; evaluating and compensating the Chief Executive Officer; and planning for Chief Executive Officer succession and monitoring succession planning for other key positions.

35.     The Individual Defendants, as officers and directors of Chemours, were also bound by the Company's Code of Conduct, its Code of Ethics for the Chief Executive Officer, Chief Financial Officer and Controller, and its Code of Business Conduct and Ethics for the

Board of Directors (collectively, the "Code").  The Code sets out basic principles to guide all directors, officers, and employees of Chemours, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.  With respect to the Company's directors, officers, and employees' compliance with laws, rules, and regulations, the Code states, "we follow all applicable laws, rules, and regulations, even though they may be complex and subject to change."

      36.      With respect to the Company's directors, officers, and employees' commitment to ensure the Company's financial integrity and accurate records, the Code provides:

> We keep accurate records because it is good business practice and also because good records reinforce other ethical behaviors. That's why at Chemours, we ensure our financial and nonfinancial information is recorded promptly, accurately, and securely.
>
> - Our records—including time records, expense reports, invoices, financial entries, benefit claims, and safety records—are carefully reviewed, authorized, recorded, and reported.
>
> - We ensure that all records accurately and fairly reflect the underlying transaction.
>
> - We follow our internal record-keeping policies to ensure that transactions are recorded accurately and promptly, and are supported by all necessary documentation.
>
> - We follow the law and our retention policies when producing, storing, or destroying records and documents.
>
> - We get the necessary Chemours approvals when responding to requests for information from a government or regulatory agency.
>
> When keeping records, we do not:
>
> - Make false or misleading entries
>
> - Omit or conceal payment amount or purpose

- Keep undisclosed or unrecorded funds, accounts, or assets

- Knowingly allow illegal activities to occur

37.     The Code sets forth specific standards of conduct for the Company's CEO, CFO,

and Controller.  In particular, the Code provides:

> In performing his or her duties, the Chief Executive Officer, the Chief Financial Officer, and the Controller shall
>
> - exhibit and promote honest and ethical behavior within the Company, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships as described in the Company's Code of Conduct;
>
> - promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission and in other public communications made by the Company;
>
> - comply with applicable governmental laws, rules and regulations; and
>
> - report promptly any violation of this Code of Ethics to the Chair of the Audit Committee.

38.     The Code also prohibits insider trading.  In particular the Code states:

> We may have access to nonpublic information ("inside information") about Chemours that could affect the value of Chemours or other companies' securities. Trading in Chemours securities when we have inside information or sharing inside information with others can be illegal and result in severe individual penalties.
>
> - We do not discuss inside information about Chemours or any other company except as required by our regular employment duties, and we do not post inside information on social media.
>
> - We do not spread false information about Chemours or any other company.
>
> - We do not trade Chemours securities or the securities of any other company based on inside information.

**Additional Duties of the Audit Committee Defendants**

39.      In addition to these duties, under its Audit Committee Charter, the Audit Committee Defendants, defendants Anastasio, Bell, Cranston, Crawford, and Kane, owed and owe specific duties to Chemours to assist the Board in overseeing the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements, among other things.  In particular, the Audit Committee Charter states:

**Committee Duties and Responsibilities**

In carrying out its responsibilities, the Committee shall:

*      *      *

1.  Discuss the quarterly and annual financial statements and related footnotes of the Company and its subsidiaries with management and the independent auditor, as well as the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

2.  In connection with the preparation of quarterly and annual financial statements of the Company and its subsidiaries and otherwise as is necessary, review, or as appropriate the Chair on behalf of the Committee shall review, with the independent auditor and management on a timely basis any matters appropriate or required to be discussed by applicable accounting and auditing professional standards or applicable regulations.   These discussions shall include, as appropriate, any significant financial reporting issues; judgments about the quality and acceptability of accounting principles as applied to the Company's financial reporting, including the receipt from the independent auditor of a report on alternative treatments of financial information within generally accepted accounting principles discussed with management, the ramifications of such alternatives, and the treatment preferred by the independent auditor; the reasonableness of significant judgments made in connection with the preparation of the Company's financial statements and the clarity of the disclosures therein and any analyses prepared by management or the independent auditor with respect thereto; the effect of regulatory and accounting initiatives and off-balance sheet structures on the Company's financial statements; and the adequacy of the Company's internal controls and the internal auditor's response thereto.

3.  Recommend to the Board whether to include the audited financial statements in the Company's Form 10-K.

4.  Discuss generally earnings press releases and the financial information and any earnings guidance provided to the Company's analysts and rating agencies, as well as the disclosure of any "pro forma" or "non-GAAP" information.

5.  Review both the acceptability and quality of major changes to the Company's accounting principles and practices as suggested by the independent auditor, Chief Audit Executive or management, and oversee the resolution of any disagreements between management and the independent auditor regarding financial reporting issues.

6.  Discuss generally with management, the independent auditor and the Chief Audit Executive the selection, application and disclosure of critical accounting policies and estimates used by the Company.

7.  Review disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting, any fraud involving any employees who have a significant role in the Company's internal control over financial reporting, and any significant changes in internal controls over financial reporting or in other factors that could significantly affect internal controls over financial reporting, including any corrective actions with regard to significant deficiencies and material weaknesses.

8.  Review and discuss with the independent auditor its assessment of the effectiveness of the Company's internal controls over financial reporting, whether any changes are necessary in light of such assessment, and the basis for its report on the Company's internal controls.

9.  Review and discuss with management their assessment of the effectiveness of the Company's disclosure controls and procedures and whether any changes are necessary in light of such assessment.

10. Review with the General Counsel or the attorney(s) designated by the General Counsel any legal matters that may have a material impact on the financial statements.

11. Oversee the establishment of and monitor procedures for: (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting control or auditing matters; and (ii) the confidential, anonymous submission by the employees of the Company of concerns regarding accounting or auditing matters.

**Breaches of Duties**

40.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Chemours, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

41.     The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to make improper statements to the public, improper practices that wasted the Company's assets, and caused Chemours to incur substantial damage.

42.     The Individual Defendants, because of their positions of control and authority as officers or directors of Chemours, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Chemours has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

43.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Chemours, regarding the Individual Defendants' management of Chemours' operations and its true environmental liabilities; (ii) facilitate defendants Vergnano and Newman's illicit sale of almost $17 million of their personally held shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Chemours and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

45.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's inherited environmental liabilities.

46.     The Individual Defendants accomplished their conspiracy, common enterprise, or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, or common course of conduct complained of herein.

47.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with

knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

48.     Chemours is a chemical manufacturer that produces a wide range of industrial and specialty chemical products for various markets.  The Company was created in 2015 as a spin-off of the "Performance Chemicals" division of DuPont.  Chemours is organized into three business segments: Fluoroproducts, Chemical Solutions, and Titanium Technologies.  Fluoroproducts is by far the most significant operating segment, accounting for approximately 50% of the Company's profits and revenues.  The Fluoroproducts segment manufactures PFAS, which are durable, chemical compounds found in common household products, including nonstick cookware such as Teflon, water repellants, and coated papers.

**DuPont's Long History of Discharging Toxic Substances into the Environment**

49.     DuPont's Performance Chemicals division had a long history of discharging toxic chemical substances, specifically PFAS, into groundwater drinking supplies near its chemical plants.  The same chemical properties that make PFAS so durable also cause them to not break down in the environment, such that they have been deemed "forever chemicals."  PFAS are also highly toxic because they build up (or "bio-accumulate") in the blood stream of those who ingest the contaminated water or air.  This leads to serious adverse health consequences, including deadly cancers.

50.     The general public did not know about the harms of PFAS until recently.  Indeed, only this past year, in the fall of 2019, did the U.S. Congress assign a subcommittee to consider legislation to regulate these highly dangerous chemicals.  Shockingly, however, internal

documents reveal that these harms were known to DuPont and Chemours for decades.  Robert A.

Bilott ("Bilott") (author of the book *Exposure*, which recounts his role as the lawyer representing

numerous individuals who were harmed by PFAS discharged by DuPont) confirmed this

knowledge during a Congressional hearing held on September 10, 2019, by the House

Subcommittee on the Environment.  In particular, Bilott stated:

> The public may only now be realizing the scope of this problem, but the
> companies that manufactured these chemicals [i.e., Chemours and DuPont] have
> been aware of the risks for decades but failed to alert the rest of us.  I know
> because I spent the last 20 years of my career in litigation with these companies,
> pulling out of their own internal files what was already there and was already
> known about the risk of these chemicals.

51.     The "internal files" referenced by Bilott, which were considered by the House

Subcommittee, showed that DuPont itself had conducted extensive internal research over the

course of decades into the harmful effects of PFAS, and in particular perfluorooctanoic acid

("PFOA"), which is among the most prevalent PFAS.  For example, DuPont's scientists began

documenting the health effects of PFAS in the 1950s.  By the 1960s and 1970, DuPont had

compiled data in its files from animal studies showing toxic effects on multiple species,

including rats, dogs, rabbits, monkeys, and multiple types of organ systems.  DuPont officials

knew at the time that PFAS were building up in the blood of humans and staying there for

extended periods of time.  By the 1980s, DuPont became concerned about liver damage and birth

defects among its own workers that were exposed to PFAS, causing it to remove all female

employees from Teflon-related jobs, and conducted internal studies on animals that caused

DuPont to label PFOA as a possible human carcinogen.  In the 1990s, DuPont's animal studies

confirmed that PFOA exposure could cause testicular, liver, and pancreatic tumors in rats, which

a DuPont scientific paper concluded posed the same risks for humans.

52.     DuPont's Performance Chemicals division's discharges of toxic PFAS into the environment brought PFAS-related litigation, which led to comprehensive scientific studies directly linking PFAS to exposure to significant and deadly health issues.  For instance, in 2005, as part of a settlement concerning DuPont's alleged PFOA contamination from its Washington Works site in Parkersburg, West Virginia (one of the litigations spearheaded by Bilott) DuPont agreed to fund a "medical monitoring" health project aimed at determining the medical harms experienced by the exposed local population.  As part of the settlement, a panel of experts was established to study the effects of PFOA exposure by examining the blood of approximately 70,000 residents.  The panel completed its analysis in 2012 and concluded that there were "probable links" between PFOA exposure and high cholesterol, ulcerative colitis, pregnancy-induced hypertension, thyroid disease, testicular cancer, and kidney cancer.  This led to 3,500 individuals coming forward as having been diagnosed with one of the six diseases due to PFOA exposure from Washington Works, resulting in a multidistrict litigation filed in the U.S. District Court for the Southern District of Ohio against DuPont (the "Ohio MDL"), which Chemours inherited at the time of its spin-off in 2015.

53.     DuPont's extensive internal knowledge of the adverse health consequences of PFOA exposure led to an attempted shift to a different type of PFAS, called "GenX," that was purportedly less toxic.  In 2009, the U.S. Environmental Protection Agency ("EPA") reviewed data submitted by DuPont for two types of GenX compounds.  When the EPA reviewed the data, however, it voiced concerns that, just like DuPont's previously produced PFAS, GenX would "persist in the environment" and "could bio-accumulate, and be toxic ... to people, wild animals, and birds."  The EPA therefore issued a consent order (the "Consent Order," also later inherited by Chemours) requiring DuPont to recover, destroy, or recycle GenX at a 99% rate from all

effluent process streams and air emissions.  The Consent Order concluded that GenX could be "toxic" to humans and that "uncontrolled ... disposal of [GenX] may present an unreasonable risk of injury to human health and the environment."

**DuPont Spins Off Its Performance Chemicals Division, Which Ultimately Becomes Chemours**

54.     With the mounting exposure to costly PFAS-related litigation and environmental remediation expenses, DuPont embarked on a plan to restructure the company to rid itself of the Performance Chemicals division and its associated liabilities altogether.  This plan would result in the formation of Chemours as an independently traded company.

55.     In 2013, DuPont launched "Project Beta," an initiative aimed at off-loading DuPont's Performance Chemicals division and its substantial associated environmental liabilities. However, DuPont quickly realized that the magnitude of these environmental liabilities meant that an outright sale of the Performance Chemicals division was not financially feasible because no rational buyer would assume such bottomless uncapped liabilities without a commensurate discount, one that would defeat the purpose of the transaction altogether.  Accordingly, DuPont devised an alternative transaction—a divestment of its Performance Chemicals division through a spin-off that would become Chemours.

56.     On June 15, 2015, DuPont announced that its board of directors approved the spin-off of Chemours, which would take effect on July 1, 2015.  Defendants Brown and Crawford served on DuPont's board of directors at that time.  The Separation Agreement governing the spin-off, which Chemours filed in a Form 8-K with the SEC on July 1, 2015, granted Chemours less than 20% of DuPont's business lines while requiring it to assume numerous significant liabilities.  These liabilities included: (i) $4 billion in debt, with Chemours being required to use the proceeds of that debt to authorize a $3.91 billion dividend back to

DuPont; (ii) 90% of DuPont's pending litigation by volume of cases, including growing PFOA-related litigation across the country; (iii) 67% of DuPont's environmental liabilities covering over eighty sites; and (iv) liabilities that had nothing to do with Chemours' business, such as benzene liability DuPont had failed to rid itself of in connection with the sale of its Performance Coatings business to the Carlyle Group L.P. ("Carlyle") because Carlyle would not agree to assume that liability.  In addition, the Separation Agreement required Chemours to defend and indemnify DuPont against any liability "relating to, arising out of, by reason of or otherwise in connection with" the liabilities that DuPont had assigned to Chemours without limitation, and provided that Chemours could not seek any recourse from DuPont with respect to any of those liabilities.

57.    Shortly after the spin-off, Chemours faced a liquidity crisis that forced it to, among other things, lay off 1,000 employees, close plants, sell business lines, and effectuate two corporate restructurings, all of which negatively impacted Chemours' stock price.  Within a month, Chemours' stock price fell from $21 per share at the time of the spin-off to $11.40 per share.  Within seven months, Chemours' stock price plummeted to $3.06 per share, an 85% decline.

**Chemours Unveils a "Transformation Plan" to Strengthen Its Balance Sheet**

58.    Faced with significant headwinds and mounting market concerns about Chemours' viability, the Company sought to reassure investors that it was solvent and that its inherited liabilities were limited and under control.  To do so, Chemours unveiled what it called a "Five-Point Transformation Plan" that would purportedly "transform" the Company's distressed balance sheet:

**Chemours Five-Point Transformation Plan**

Following the Separation, Chemours developed a Five-Point Transformation Plan to address changes to our organization, cost structure and portfolio of businesses.

We have made considerable progress on our transformation plan throughout 2016, with additional cost reductions and growth targeted in 2017.

The objectives of our multi-year five-point transformation plan are to improve our financial performance, streamline and strengthen our portfolio and reduce our leverage by:

1. Reducing our costs through a simpler business model;

2. Optimizing our portfolio to focus on our businesses where we have leading positions;

3. Growing our market positions where we have competitive advantages;

4. Refocusing our investments by concentrating our capital expenditures on our core businesses; and

5. Enhancing our organization to deliver our values and support our transformation to a higher-value chemistry company.

59.    Defendant Vergnano stated that the "key financial outcome of [Chemours'] transformation plan" was a strengthened, solid balance sheet, which would be evidenced by a significant reduction in the Company's "net leverage ratio,"[1] a critical financial measure of its financial health.  At the time of the spin-off, Chemours had an extremely high net leverage ratio, over 6x debt-to-EBITDA.  However, the Individual Defendants maintained that, as a result of the Five-Point Transformation Plan, the Company would "reduce [its] net debt to EBITDA leverage ratio to approximately 3x."  Defendant Vergnano stated that the Company expected to reach this target by year-end 2017.    Defendant Vergnano also emphasized that the Five-Point Transformation Plan was a direct response to market concerns about Chemours' solvency after the spin-off in an interview with *Fortune* magazine on May 18, 2016.  In particular, he stated:

---

[1] A company's net leverage ratio measures how many years it would take for it to pay back its debts.  The net leverage ratio is calculated by dividing net debt by adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA").

You had this high dividend put on us as well as all this debt [at the time of the spin-off].... So I think investors were worried if we were going to be solvent— were we going to make it through this or not?

We immediately went out to explain our transformation plan to investors. ... So right from the start we put together what we called our "Five-Point Transformation Plan," which was all about getting the company de-levered as quickly as possible.

60. Importantly, Chemours could not reduce its net leverage ratio if its environmental liabilities massively outweighed its net assets, which, unbeknownst to investors, they did. The large accruals for such liabilities would dramatically reduce the Company's earnings, and therefore its adjusted EBITDA, thereby increasing Chemours' net leverage ratio by a substantial amount. Thus, the only way the Company's fiduciaries could purport to reduce Chemours' net leverage ratio was by vastly understating its true environmental liabilities.

61. They proceeded to do exactly that. In particular, the Individual Defendants repeatedly reassured investors that Chemours' inherited environmental liabilities were under control and would not turn out to be larger than expected and reported. For example, during an earnings conference call held on August 6, 2015, defendant Newman stated that the Company's liabilities were "well-understood" and "well-managed," and that the executive team (including longtime DuPont executives) had been personally monitoring the inherited environmental liabilities for a long time. In particular, defendant Newman stated:

Our environmental liabilities are well-understood and well-managed. ... It is important to understand that these [liabilities] are well-understood, and the current team has been monitoring these liabilities for many years.

62. Moreover, the Individual Defendants reassured investors by reporting precise potential maximum ranges of losses that could occur in excess of the amounts Chemours had accrued. In recognition of how heavily investors would rely on this information, defendant Vergnano reassured investors of the reliability of these maximum ranges just after the spinoff.

For example, in Chemours' Quarterly Report on Form 10-Q for the second quarter ended June 30, 2015, filed on August 6, 2015, with the SEC, the Company reported that it accrued $302 million for environmental remediation and stated that "the potential liability may range up to approximately $650 [million] above the amount accrued[.]"  During the related earnings call held that same day, one analyst asked, "[W]hat's the probability your crude environmental liability increases by your stated [maximum] risk of $650 million?"  In response, defendant Vergnano claimed that the probability was very low because the liabilities were "very well characterized, very well documented sites," and "we don't see anything that's going to be a surprise."

**Chemours Inherited $2.5 Billion of "Massive Historical Liabilities" from DuPont Rendering It Insolvent at the Time of the Spin-off**

63.     On May 13, 2019, Chemours filed an action against DuPont in the Delaware Court of Chancery.  In its Verified Complaint, the Company admitted that, rather than it successfully being "transformed" or its inherited environmental liabilities being limited and under control from the time of the spin-off, the exact opposite was true.  In truth, DuPont had saddled Chemours with liabilities so massive (at least $2.5 billion in the aggregate, based on Chemours' own conservative estimate) that rendered Chemours "insolvent" from the date of the spin-off from DuPont.  Indeed, Chemours brought the lawsuit against DuPont "to hold DuPont accountable for its certified liability maximums," which, according to the Company, "have proved to be systematically and spectacularly wrong" and in violation of Delaware law.

64.     However, in the Company's sworn pleading, defendants admitted that they knew the liabilities Chemours inherited from DuPont were so massive that they rendered Chemours legally insolvent "on day one."  In a hearing held on December 18, 2019, Chemours counsel confirmed that, "in no uncertain terms," "as of the date of the spin[-off], Chemours was insolvent."  Chemours asserted that DuPont had falsely certified that Chemours was solvent by

providing "maximum" estimates of the transferred liabilities that were "undertaken in a way that can only lead to an inference of bad faith" and "systematically and spectacularly" understated by billions of dollars, such that the "entire spin-off process was a sham."  According to Chemours, DuPont deliberately "engineered a vastly understated valuation of the liabilities it would impose on Chemours to try to square the spin-off with Delaware law."  Specifically, Chemours described that while DuPont engaged investment bank Houlihan Lokey to prepare a purportedly independent financial analysis of Chemours' solvency as of the spin-off date, "DuPont arranged for Houlihan Lokey to predicate its analysis" solely on DuPont's own "High End (Maximum) Realistic Exposure" numbers that DuPont calculated itself.  In actuality, "DuPont engineered the 'High End (Maximum) Realistic Exposure' figures in a way that would massively understate the real potential maximum exposure."

65.     As an example of DuPont's "bad faith," Chemours stated that DuPont "cut-and-pasted" the figures it had used to prepare its accounting reserves, even though this approach "obviously and necessarily understated the actual maximum liabilities."  Chemours claimed this understatement was "obvious" because DuPont's accounting reserves included only liabilities that were viewed as "probable and estimable" as of December 31, 2014, which automatically excluded "two critical components of any realistic assessment of true maximum liabilities": (i) liabilities deemed possible, but not probable, "no matter how vast, imminent or possible the potential liability was, and even where DuPont knew that higher clean-up costs were possible"; and (ii) "liabilities that were regarded as probable at the time, but for which DuPont had not yet made an estimate."  Accordingly, DuPont's liability "maximums" were "obviously" understated because, "by definition," they "excluded consideration of risks that clearly existed."

66.    Chemours was fully apprised and aware of this scheme.  For instance, DuPont presented its "maximums" to defendant Newman in May 2015.  Defendant Newman, as CFO, was required to certify their accuracy before they were passed on to Houlihan Lokey.  However, Chemours claimed that defendant Newman was so dubious of DuPont's "maximums" that he "refused to sign the certification[s]" unless they "expressly recite[d] ... [that] the liability numbers relied upon by [defendant Newman] were those vouched for by DuPont itself—nothing more."

67.    Chemours described how defendant Newman sent an eleventh-hour e-mail to DuPont's senior management that stressed that Chemours was drastically under-reserved and begged for additional funds to keep the Company operational on its first day of existence. Specifically, Chemours stated that, "leading up to a subsequent meeting with DuPont's senior management in June 2015"—only a month before the spin-off would take effect—"[defendant Newman] sent an email [to DuPont] pleading that he needed an additional $200-300 million in cash reserves to function on day one."  This $300 million constituted almost 100% of the Company's beginning environmental accruals of $316 million.  Significantly, however, DuPont refused to increase the Company's reserves at all, and condemned defendant Newman for putting his plea in writing.  As Chemours' Verified Complaint made clear, DuPont "castigated" Newman for putting the request in an e-mail in an effort to keep Chemours' dire financial status under wraps—an effort Chemours was itself complicit in, and would continue for years.

68.    Chemours further stated that DuPont adopted similar tactics to understate "maximum" exposure estimates for other categories of liabilities.  For example, with respect to multiple categories of litigation that would be transferred to Chemours, DuPont purportedly relied on an analysis conducted by Deloitte Transactions and Business Analytics LLP

("Deloitte"), which Chemours knew was deeply flawed.  Indeed, Chemours stated that Deloitte's analysis specifically advised DuPont that Deloitte did not present worst case scenarios, and therefore could not be interpreted as actual "maximums."  Regarding PFOA litigation, Chemours knew that Deloitte did not actually evaluate, assess, or examine DuPont's PFOA cases in any meaningful way.  Instead, Deloitte robotically applied the universal success rate for all tort cases generally, assigning DuPont the same chance of victory as all other defendants in the jurisdictions where the cases were pending.  From these success rates, Deloitte surmised that 20% of the cases would go away for nothing, that DuPont would win 68% of the trials, and that the remaining cases could be settled inexpensively.  However, as described herein, DuPont lost every trial in connection with the Ohio MDL, such that the settlement of 3,500 out of 70,000 potential cases cost $671 million.  Deloitte similarly utilized such mechanical applications of success rates to other liabilities, including PFAS, benzene, and general litigation.

69.     Thus, as Chemours repeatedly emphasized during the December 18, 2019 hearing, DuPont's "maximum" estimates of Chemours' inherited liabilities were "spectacularly wrong," and "not by a little bit."  Rather, the liabilities were understated by "many hundreds of millions of dollars.  And we're just four years out. ... This isn't normal course, Your Honor.  This is exceptional.  It's outrageous.  I think it's unprecedented. ... [A]ll this evidence here ... all of it is well-pleaded.  All of it is based on clear evidence, and all will be proved."

70.     These same liabilities that rendered the Company insolvent since its inception did not improve prior to or before the relevant period (February 2017 through August 2019), but rather has continued to exist throughout Chemours' entire history as a public company.  As the Company's sworn pleading states, in formulating the liability maximums, "DuPont ... made no effort to assess or evaluate the *real* maximum potential liabilities."  Rather, DuPont "employed

an unreasonable process that would predictably understate the liability profile it was creating for Chemours" and as a result, spun off Chemours as an insolvent company.  Yet, remarkably, Chemours did nothing to correct this "understate[d] ... liability profile" for years, nor did it reveal these massive liabilities or its resulting insolvency to the public.  To the contrary, Chemours told a strikingly different story to the investing public in which it regularly promoted itself as a spin-off success.

## CHEMOURS UNDERSTATES NUMEROUS CATEGORIES OF ITS INHERITED LIABILITIES BY SIGNIFICANT AMOUNTS IN ITS FINANCIAL STATEMENTS

71.     As described above, Chemours inherited substantial liabilities from DuPont, rendering it insolvent from the date of its spin-off.  However, despite their knowledge of these liabilities, the Individual Defendants publicly and repeatedly understated each of these liabilities for over two years between February 2017 and August 2019.  The Individual Defendants even represented that the Company accrued nothing at all for certain categories of liabilities for which DuPont had provided specific estimates amounting to hundreds of millions of dollars that Chemours claimed in its pleadings were woefully deficient.  In all, the categories of liabilities impacting the Company included litigation concerning PFOA, litigation related to pollution in its New Jersey sites, litigation related to contamination in its Fayetteville Works site, litigation related to benzene exposure, and PFAS and GenX litigation.  These liabilities amounted to $2.5 billion, as a conservative estimate, which Chemours was saddled with at the time of the spin-off as it admitted in its Verified Complaint against DuPont.

**The PFOA Litigation**

72.     3,500 individuals brought claims for injuries arising from DuPont's discharges of over one million pounds of PFOA between 1951 and 2003 from its Washington Works facility in Parkersburg, West Virginia into the Ohio River.  These claims were consolidated in the Ohio

MDL.   The contamination alleged therein caused six significant health conditions in the individuals, including two types of deadly cancer, which the appointed science panel (appointed in 2012) concluded had "probable links" to PFOA exposure.

73.     Chemours has admitted in its pleadings against DuPont that, in connection with the spin-off, DuPont certified that the "High End (Maximum) Realistic Exposure" for these 3,500 cases was $128 million, including defense costs.   However, as Chemours admitted, "[t]his number was a baseless concoction" because "DuPont was paying substantial sums annually on defense costs alone" and "[t]hese were serious cases—hundreds of cancer victims, others with other serious diseases, and DuPont was barred under the settlement agreement from raising a principal defense [causation]."

74.     Chemours also stated that it soon "became clear that [DuPont's] $128 million maximum would be exceeded—indeed, greatly so."   Specifically, in late 2015 and 2016, DuPont lost the first three individual trials in the Ohio MDL, forcing it to pay out $20 million.   Indeed, contrary to Deloitte's estimate for DuPont that DuPont would win 68% of the PFOA trials, "DuPont lost *every* trial."   In light of these losses, on February 11, 2017, DuPont and Chemours settled the 3,500 cases for $671 million, i.e. "well over *five times* the [$128 million] 'maximum' that DuPont had certified just 19 months before."   DuPont ultimately agreed to cover half the settlement despite the blanket indemnification provisions of the Separation Agreement, with DuPont and Chemours paying out $335 million each.   Although DuPont also agreed to pay up to $125 million for any additional PFOA litigation, DuPont made clear that this was the extent of its willingness to contribute anything toward the liabilities it had fully assigned to Chemours.

75.     On February 16, 2017, the Company misleadingly announced that the Ohio MDL settlement was the full materialization of its PFOA liability exposure, such that it was now a

"known" liability.  Defendant Vergnano further emphasized that the "big overhang" from this liability was "really behind us now."  However, the PFOA litigation was far from over.  The Ohio MDL resolved only 3,500 of cases of exposure to PFOA-contamination from Washington Works, cases that were restricted to individuals who were sickened by one of the six conditions identified by the science panel (leaving out others potentially harmed from severe birth defects or other cancers caused by PFOA exposure), and individuals who had been diagnosed with their condition prior to February 11, 2017.  Indeed, the number of personal injury cases against Chemours arising from PFOA exposure increased tenfold from the third quarter of 2017 to the third quarter of 2018, amounting to approximately sixty cases, and continued to increase through August 2019.  Most, if not all, of these cases were consolidated before the same judge as the Ohio MDL.  Some cases sought up to $120 million in damages, and recently, on March 3, 2020, one of these cases resulted in a $50 million verdict against DuPont and Chemours.

76.    Despite these known facts, the Company accrued virtually nothing for PFOA litigation between February 2017 and August 2019.  Aside from accruing $335 million specifically for the settlement of the Ohio MDL in early 2017, the Company never accrued more than $14-22 million for all PFOA litigation during the entire period, with portions of even this amount pertaining to the Company's "obligations under agreements with the [EPA]" to test drinking water around Company sites.  This *de minimis* accrual amounted to far less than half of the $50 million verdict that was handed down against Chemours in just one of the sixty cases pending during the relevant period.  Moreover, Chemours essentially maintained no reserve despite the fact that, as it admitted in its Verified Complaint against DuPont, it knew that DuPont's $128 million liability estimate—which concerned only a fraction of the potential PFOA

claims related to the Washington Works site alone—was a "baseless concoction" that was dramatically and "spectacularly" understated.

77.      Furthermore, beginning in the third quarter of 2018, the Company stated in public filings that any loss in excess of amounts accrued for PFOA litigation would not "have a material impact" on the Company's financials.  However, even assuming the verdicts in the sixty pending PFOA-related cases amounted to only $25 million (half the size of the judgment in just one case), and that no future PFOA cases were filed, Chemours would be facing no less than $1.5 billion in liability from these cases alone.  Further still, this figure does not take into account the costs of governmental litigation related to historical PFOA emissions, or civil litigation from individuals harmed by PFOA exposure at sites other than Washington Works.  Accordingly, rather than not having any "material impact," PFOA-related litigation alone posed a significant and even existential threat to the Company.

**New Jersey Litigation**

78.      Chemours inherited four sites in New Jersey from DuPont, two of which (Chambers Works and Pompton Lakes Works) were especially toxic sites that had been polluting the environment for decades.  Chambers Works produces approximately 1,200 toxic chemicals, including PFOA, and has allegedly released 107 million pounds of hazardous waste into the surrounding soil, air, and drinking water wells.  Pompton Lakes Works is a former munitions facility where DuPont dumped untreated cleaning solutions for decades into a waterway that became known as "Acid Brook."  In 2018, New Jersey Governor Phil Murphy compared Acid Brook to Love Canal, the notorious site that forced Congress to set up the "Superfund," a comprehensive federal program designed to clean up the nation's most contaminated sites.

79.     In its SEC filings, Chemours somehow never accrued more than $101 million for remediation costs across the highly polluted New Jersey sites during the relevant period, despite knowing that these accruals were dramatically understated by at least half a billion dollars. Chemours itself admitted in its Verified Complaint against DuPont that, from the time of the spin-off through 2018, it had received multiple estimates from DuPont quantifying these liabilities at hundreds of millions of dollars higher than the Company's accruals.  Moreover, Chemours admitted that even these much higher estimates from DuPont were "implausib[ly]" low.

80.     In its Verified Complaint against DuPont, Chemours revealed that, at the time of the spin-off, DuPont provided a "maximum" estimate for the New Jersey environmental liabilities it was transferring to the Company of $337 million, which Chemours asserted was clearly a substantial understatement.  Even when DuPont "revised its liability estimate upward to approximately $620 million" in 2018, Chemours stated that "it [was] evident (again) that the 'maximum' potential liability [was] not what DuPont certified it was."  Chemours stated that this was demonstrated by New Jersey's response that it was "implausible" that DuPont's $620 million estimate "could represent 'good-faith estimates of [DuPont's historical New Jersey] environmental obligations and liabilities.'"

81.     Yet, despite knowing this information, Chemours accrued a total of just $101 million for remediation across all New Jersey sites between February 2017 and August 2019. This was $230 million less than the initial $337 million estimate DuPont gave Chemours that the Company stated was vastly understated, and half a billion dollars less than the revised $620 million estimate DuPont gave Chemours in 2018 that the Company stated was "implausib[ly] low."  These understatements were highly material given that they amounted to 23% and 50%,

respectively, of the Company's annual net income of approximately $1 billion.  In addition, despite DuPont increasing its estimate of the New Jersey liabilities by nearly $300 million in 2018, the Company actually decreased its combined reserves for its New Jersey liabilities between February 2017 and August 2019 by $38 million, or nearly 40%.

82.     In line with Chemours' assertion that DuPont's $620 million estimate was "implausib[ly]" low, Chemours disclosed in its sworn pleading that it had also been sued by a local New Jersey municipality, Carneys Point, for $1.1 billion.  This figure was based on what it would cost to remediate Chambers Works, which is just one of the four inherited New Jersey sites.  Importantly, Chemours admitted in its Verified Complaint that the lawsuit was so meritorious that Chemours was highly likely to incur the $1.1 billion cost, one of the major liabilities that had rendered the Company insolvent at the time of the spin-off, necessitating the Company's lawsuit against DuPont.  Chemours further admitted that its own senior-level employee, one that carried her position from DuPont to the Company after the spin-off, was complicit in concealing the $1.1 billion cleanup required for Chambers Works from state regulators.  Thus, Chemours knew from the time of the spin-off that the remediation liability for one site alone exposed it to over $1 billion in remediation costs.  Yet, Chemours never reserved more than $24 million for remediation of Chambers Works, which is an understatement of over 4,000%.  Moreover, Chemours never reported during the relevant period a reserve of more than $101 million for environmental remediation costs across all of its New Jersey sites, which is an understatement of at least 1,000% based on Chambers Works alone.

**North Carolina Litigation**

83.     In its Verified Complaint against DuPont, Chemours confirmed that its remediation accruals for its inherited Fayetteville Works site in North Carolina were drastically

understated.  Specifically, Chemours and DuPont were aware in 2010 that, despite the Consent Order from the EPA requiring reduction of GenX emissions at a 99% rate, Fayetteville Works was dumping GenX into the Cape Fear River for decades.  This led to an internal DuPont-commissioned "Blue Ribbon Panel," which later determined that it would cost at least $60 million just to stop *future* PFAS emissions from Fayetteville Works (an amount that excluded significant additional costs to clean up historical PFAS emissions that had already occurred).  However, the Company accrued nothing for the remediation of Fayetteville Works between the first quarter of 2017 and the fourth quarter of 2018, and even then accrued only *de minimis* amounts ranging from $10-25 million.  As Chemours stated in its complaint filed just days after the accruals, the actual cost was over eight times this amount, or in excess of $200 million.

84.     Chemours further stated that, at the time of the spin-off, DuPont certified a "High End (Maximum) Realistic Exposure" of only $2.09 million for Fayetteville Works.  This amount, according to Chemours, was "inexcusably" low because DuPont knew that, despite the Consent Order, "the Fayetteville plant had been discharging [GenX] for 30 years or more into the Cape Fear River, which serves as the source of drinking water for tens of thousands of people."  As evidence of this, Chemours cited the Blue Ribbon Panel that recommended that DuPont invest no less than $60 million in technology to end future PFAS discharges into the Cape Fear River.  Instead, DuPont installed a $2.3 million system that only eliminated one of several waste streams responsible for the pollution, and then terminated the rest of the project in 2013, around the time it sought to spin off Chemours.  As a result, in the fall of 2017, the State of North Carolina and a consolidated putative class of North Carolina residents filed suit against the Company and DuPont.  In October 2017, DuPont demanded that, pursuant to the Separation Agreement, Chemours indemnify it for the entirety of this liability.  As Chemours stated in its pleading, it is

"indisputable that DuPont's $2.09 million maximum will not suffice against this litigation—not even close." Chemours stated that this was confirmed by a consent order the Company entered into with North Carolina in February 2019 to settle the State's claims, which required the Company to undertake remediation efforts that would cost "in excess of $200 million." The consolidated class action remains pending.

85.   Importantly, Chemours knew the full extent of the Fayetteville Works liability for years before the spin-off from DuPont. First, at the time of the spin-off, the executives who were directly in charge of DuPont's Performance Chemicals division (including Fayetteville Works) were the same individuals who became the executive leadership of Chemours. Specifically, defendant Vergnano oversaw the Performance Chemicals division at DuPont for five years prior to the spin-off from October 2009 until July 2015. Defendant Vergnano was therefore aware of the PFAS emissions caused by Fayetteville Works, and of the Blue Ribbon Panel convened in 2010, during his tenure. Indeed, at the September 10, 2019 Congressional hearing on PFAS, in response to questions about Chemours' knowledge of the extent of liabilities at Fayetteville Works, DuPont's Chief Operating and Engineering Officer, Daryl Roberts ("Roberts"), confirmed that defendant Vergnano "ran the business line [i.e., Performance Chemicals]" at DuPont, and therefore "made decisions about the business line for many, many years, and their plants made the products we are talking about today." Roberts stated that it was "very difficult" for Chemours to say that it had not known about the true size of the Fayetteville Works liability, even before 2015. In particular, he stated:

> What I would say, when we hear the statement that Chemours then later found out [about the size of the Fayetteville Works liability], is that the individuals that were running the sites, the individuals that were developing the products, the individuals that ran this business related to the sites that were fully aware of the financials of the business, fully aware of the liabilities and profits and understood what [Chemours] was taking with it, are ***the same individuals that sit and run***

*Chemours today. ... When the head of the [Performance Chemicals] business is now the CEO [of Chemours], it's clear that there's ownership.  And an individual who was part of those discussions, who the scientists work for and is currently running Chemours, it makes it very difficult to say we don't know anything about it before 2015.*

86.     Second, in his written response to questions for the record following the congressional hearing, Roberts stated that it was Sheryl Telford, the former Director of Remediation at DuPont who took the same position at Chemours after the spin-off, who engineered the "inexcusable" $2.09 million estimate of remediation costs for Fayetteville Works. Specifically, Roberts stated that "Chemours' own employee," who "was quite familiar with environmental conditions at the locations that were transferred to Chemours ... estimated a range between $507,000 and $2.09 million related to contingent environmental remediation liabilities, for which reserves were established."

87.     Third, defendants confirmed their full knowledge that Fayetteville Works was dumping GenX into the Cape Fear River for nearly four decades.  For example, on June 7, 2017, the Wilmington, North Carolina, newspaper, *StarNews*, published an exposé on Fayetteville Works that cited scientific studies that had found significant discharges of GenX in the Cape Fear River.  As a result of growing media and regulatory scrutiny following the exposé, the Company's executives attended a closed-door meeting on June 15, 2015, to discuss the issue with the North Carolina Department of Environmental Quality ("NC DEQ").  One member of the press was allowed to attend.  During the meeting, these executives admitted that Chemours (and DuPont's Performance Chemicals division before the spin-off) had known about the discharge of GenX into the Cape Fear River for decades.

88.     Yet, despite their knowledge, for the majority of the relevant period defendants maintained no reserve whatsoever for Fayetteville Works.  In fact, Chemours accrued nothing for

remediation costs for Fayetteville Works until the fourth quarter of 2018, at which point it accrued only $10 million. In its Quarterly Report for the first quarter of 2019 filed with the SEC on May 3, 2019—three months after the Company entered into a consent order with NC DEQ that required over $200 million in remediation costs and just ten days before the Company filed its Verified Complaint against DuPont—Chemours accrued only $25 million, an understatement of 700%. Furthermore, during the relevant period, Chemours accrued nothing for any private litigation arising from GenX discharges from Fayetteville Works.

**Benzene Litigation**

89.     Benzene is a chemical compound commonly used in plastics, Styrofoam, adhesives, and pesticides. Benzene's toxicity has been well known and documented for decades. According to the Occupational Safety and Health Administration ("OSHA"), the "benzene-leukemia link was first identified in 1897," and in 1948, the American Petroleum Institute stated that "it is generally considered that the only absolutely safe concentration for benzene is zero." Under the Company's Separation Agreement with DuPont, Chemours inherited twenty-nine benzene-related lawsuits.

90.     Chemours admitted in its Verified Complaint against DuPont that it drastically understated its exposure to benzene liability. Indeed, the Company maintained no reserve between February 2017 and August 2019 for its inherited benzene litigation and repeatedly told investors that such liability could not be estimated. However, Chemours contradictorily stated in its complaint that DuPont had given it a detailed "comprehensive study" quantifying its inherited benzene litigation for no less than $111 million, a material amount representing over 10% of the Company's annual net income of approximately $1 billion. The Company noted that in 2017 DuPont "commissioned a more comprehensive study by a consultant" that "valued the potential

maximum costs at over $111 million," or "6-7 times higher."  DuPont purportedly shared this study with Chemours in 2018.  Thus, Chemours knew that its inherited benzene liability was at least $111 million in 2018.  Indeed, even before the commissioned "comprehensive study," Chemours knew these liabilities were much more substantial than DuPont's estimated "maximum," which Chemours asserted was $17 million for "all its benzene-related liabilities," including defense costs.  As it stated in its complaint, when DuPont sold its Performance Coatings business to Carlyle, "DuPont could not get Carlyle to assume the benzene liability, even though Carlyle was purchasing the business that actually generated it."

91.     Despite knowing about the estimated $111 million liability at minimum, Chemours' fiduciaries maintained throughout the relevant period that, although it was possible that Chemours could incur a loss related to the benzene litigation, "a range of such loss[] cannot be reasonably estimated at this time."

**PFAS and GenX Litigation**

92.     In its Verified Complaint against DuPont, Chemours referenced "rapidly unfolding litigation regarding PFAS," stating that "[a]lthough PFOA is one such substance, PFAS involves other substances," such as GenX, and thus "goes beyond the parties' prior settlement regarding PFOA."  Chemours disclosed that PFAS litigation against Chemours was "proliferating," and many cases "have been consolidated in a multi-district litigation in federal court in South Carolina," with additional cases pending in New Jersey and North Carolina. Significantly, Chemours stated that at the time of the spin-off DuPont "did not even purport to conduct an evaluation of PFAS liability (apart from PFOA)" but instead "certified a catch-all 'High End (Maximum) Realistic Exposure' of $194 million."

93.     Despite their knowledge, defendants accrued nothing for PFAS liability between February 2017 and August 2019, not even the $194 million certified by DuPont in 2015, despite admitting in pleadings that it was already "sadly clear again that the real 'maximum' potential liabilities" far exceeded that amount.  Moreover, despite knowing that DuPont "did not even purport to conduct an evaluation of PFAS liability," neither did Chemours, which instead inexplicably relied on DuPont's 2015 estimate that Chemours itself described as baseless.

94.     In sum, in Chemours' own sworn pleading, the Company admitted to $2.5 billion in inherited liabilities Chemours at the time of the spin-off, including: (i) the Ohio MDL, which amounted to $335 million for the Company; (ii) the "implausib[ly]" low $620 million estimate DuPont provided for liabilities across all four New Jersey sites; (iii) the over $1 billion cost for the remediation of Chambers Works; (iv) the over $200 million for the remediation of Fayetteville Works; (v) the $111 million for inherited benzene liability; and (vi) the $194 million for inherited PFAS liability.  Again, as the Company stated, these figures were conservative estimates.

## THE IMPROPER STATEMENTS CONCERNING CHEMOURS' INHERITED ENVIRONMENTAL LIABILITIES AND THEIR IMPACT ON ITS FINANCIAL PROSPECTS

95.     Between February 16, 2017 and August 2, 2019, the Individual Defendants repeatedly proclaimed that their Five-Point Transformation Plan had "worked" such that Chemours' initial struggles as an independent company were completely behind it and that any possibility of its inherited liabilities being larger than expected was now "deemed remote."  In truth, Chemours' liabilities were far greater than the Company had represented, and were so massive that they had rendered the Company virtually insolvent from its inception.

96.     On February 16, 2017, Chemours held an earnings conference call with investors and analysts to discuss its fourth quarter and full year 2016 financial results.  During the call, defendants announced annual adjusted EBITDA of $822 million and net income of $7 million. Defendant Vergnano attributed these results to "truly a year of transformation guided by our five-point transformation plan," and commented that "Chemours exited 2016 in a very strong position" with the "effects of our transformation plan … evident in our earnings results."

97.     During the same call, defendants discussed the $671 million settlement of the Ohio MDL, which the Company announced just three days beforehand.  Defendant Vergnano described the settlement as largely resolving the Company's PFOA-related liabilities, stating, "I would say ... after this period as we get through the finality of the settlement we should have our [PFOA] costs come down."  Defendant Vergnano also announced that "[t]his puts us at a new leverage position of approximately 3.3 times, a tremendous reduction since spin."  Defendant Newman stated that as a result, "[w]e have sufficient balance sheet capacity to fund both our portion of [the Ohio MDL settlement] and to support planned expansions in 2017 and beyond." Defendant Newman added that "[w]e've always said we expect our environmental to be a *fairly steady, mature liability*.  Now that we have clarity around PFOA, I think from a credit perspective our view is we are in a better position today with that *as a known, certainly for the next five years*."

98.     On February 17, 2017, Chemours filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2016 (the "2016 Form 10-K").  In the 2016 Form 10-K, the Company downplayed the significance of the liabilities it had inherited from DuPont.  For example, the 2016 Form 10-K reported a total environmental remediation accrual of just $278 million, which they asserted was "appropriate based on existing facts and circumstances."  The

2016 Form 10-K further stated that the maximum range of liabilities that could occur in excess of the amounts accrued was "deemed remote" by the Company, and that "the potential liability may range up to approximately $535 million above the [$278 million] amount accrued at December 31, 2016."  It added, "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on [the Company's] financial position, results of operations or cash flows at any given year, as such obligation can be satisfied or settled over many years."  The 2016 Form 10-K further represented that Chemours did not accrue any amounts for benzene-related litigation liability, and stated that while a loss was possible, "a range of such losses cannot be reasonably estimated at this time."

99.     The 2016 Form 10-K, and each of the Company's Forms 10-K and 10-Q described herein, represented that Chemours' financial statements were "prepared in accordance" with generally accepted accounting principles in the U.S. ("GAAP").  The Forms 10-K and 10-Q each contained certifications signed by defendants Vergnano and Newman pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that assured investors that they did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." The SOX certifications also stated that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows," of Chemours.  Furthermore, the SOX certifications stated that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

100.    On March 27, 2017, financial reporters interviewed defendant Vergnano during a live television broadcast of Bloomberg Television's *Bloomberg Markets*.  During the broadcast,

defendant Vergnano repeatedly assured investors that the Company's inherited environmental liabilities were "behind us."  One reporter noted that, following Chemours' post-spin-off price decline, "[t]here is quite a bit of bearishness ... on the company," and asked defendant Vergnano "[w]hat did investors and analysts get wrong?"  Defendant Vergnano replied that Chemours inherited a number of great products and businesses from the spin-off, "but we also had some liabilities we had to deal with.  Heavy level of debt, we had some legal liabilities, ***and that now has gone behind us.  We've de-levered the company, those legal liabilities are behind us, and now people are starting to see the businesses we have turned out***."  Defendant Vergnano also asserted that the Company had "executed every [element of its] transformation plan," and as a result, "we're just about three times levered and we're where we want to be."  Later during the interview, one reporter asked defendant Vergnano about whether the settlement of the Ohio MDL removed the "overhang" of PFOA-related lawsuits, "or are we going to see more cases come forward?"  Defendant Vergnano replied, "I think that was the big issue that a lot of investors had, that one set of cases. ... So I think that ***those 3,500 cases were the big cloud, the big overhang that are really behind us now***."

101.    That same day, defendant Vergnano went on another live broadcast interview on CNBC's *Power Lunch*.  One reporter asked defendant Vergnano whether, given the Company's "global joint settlement with DuPont in terms of the PFOA issue," "are all the legal liabilities behind you at this point in terms of the money that you need to set aside or potential future litigation?"  In response, defendant Vergnano again stated that "I think that our transformation plan and the settlement that we worked out with DuPont really put those behind us."

102.    On May 2, 2017, the Company held an earnings conference call with investors and analysts to discuss its first quarter 2017 financial results, which included adjusted EBITDA

of $285 million and net income of $150 million.   During the call, defendant Vergnano announced that the Company's "transformation plan has made a huge impact on our business," as "we've achieved our target net leverage [ratio] of at or below 3x, a key commitment we made in announcing the transformation plan in August of 2015."  Defendant Newman further touted that, as a result of reaching this milestone, the Company had successfully achieved a "strong balance sheet" and an "improvement in our credit profile" that was so significant it was "recognized in [a] ratings upgrade from Moody's."

103.    On May 3, 2017, Chemours filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2017 (the "Q1 2017 Form 10-Q").  The Q1 2017 Form 10-Q reported a total environmental remediation accrual of just $279 million that the Company asserted was "***appropriate under existing facts and circumstances***," and stated that "under adverse changes in circumstances, ***although deemed remote***, the potential liability may range up to approximately $480 [million] above the [$279 million] amount accrued[.]"  The Q1 2017 Form 10-Q also stated that "management does not believe that any loss, in excess amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations or cash flows at any given year, as such obligation can be satisfied or settled over many years."  The Q1 2017 Form 10-Q further stated that "a range of ... losses [for benzene litigation] cannot be reasonably estimated," and refused to report any amount of liability for the benzene liabilities.

104.    Defendants continued to misrepresent that certain of their more significant environmental liabilities were supposedly inconsequential.  For example, on June 15, 2017, the Wilmington, North Carolina, newspaper, *StarNews*, reported on a study finding that Chemours' Fayetteville Works plant had been releasing PFAS into the Cape Fear River for many years, and

that the chemicals had contaminated the region's drinking water.  The article detailed a meeting between Chemours' staff and local and state officials on June 15, 2017, during which Chemours' staff stated that the process that was causing the contamination had been part of Fayetteville Works' operations since 1980.  However, Chemours' Product Sustainability Director, Kathy O'Keefe ("O'Keefe"), emphasized that the contamination posed absolutely no harm to human health.  In particular, O'Keefe stated:

> Our belief is that the GenX level in the drinking water coming from the Cape Fear River is safe and it does not pose any harm to human health.  We have that belief; we're confident in that belief.

105.    To emphasize this point, O'Keefe compared the purported trace amounts of GenX emitted by Fayetteville Works to the benign amounts of "formaldehyde" released "[w]hen you cook Brussels sprouts."  Chemours' Environmental Manager, Michael Johnson, added that the amount of GenX in the Cape Fear River "is very, very small.  When you look at parts per trillion, you're looking at very, very small concentrations. ... [I]t's not like there's a cup or a swimming pool."  Mr. Johnson further claimed that abatement technology DuPont had installed in 2013 had resulted in an "80 percent reduction" of any trace amounts of GenX that were present in the river.

106.    On June 20, 2017, the Company issued a press release announcing that it would be undertaking remediation activities at the Fayetteville Works site to address alleged contamination in the Cape Fear River caused by years of GenX emissions.  Still, Chemours assured investors that Fayetteville Works' emissions had not impacted the safety of drinking water.  In particular, the press release stated:

> [Chemours] today announced that it will capture, remove, and safely dispose of wastewater that contains the byproduct GenX generated from fluoromonomers production at its manufacturing plant in Fayetteville, North Carolina.  Trace GenX amounts in the Cape Fear River to date have been well below the health screening level announced by the North Carolina Department of Health and Human Services on June 12, 2017, and the company continues to believe that

emissions from its Fayetteville facility have not impacted the safety of drinking water.  However, Chemours will take these additional steps, embracing its role as a significant employer and member of the community. The capture and removal of this wastewater will commence on June 21, 2017. This action complements the abatement technology already put in place at the Fayetteville site in 2013.

107.     On August 3, 2017, Chemours filed with the SEC its Quarterly Report on Form 10-Q for the period ended June 30, 2017 (the "Q2 2017 Form 10-Q").  The Q2 2017 Form 10-Q reported a total environmental remediation accrual of just $278 million that the Company stated was "***appropriate based on existing facts and circumstances***," and further stated that, "under adverse changes in circumstances, ***although deemed remote***, the potential liability may range up to approximately $480 [million] above the [$278 million] amount accrued[.]"  The Q2 2017 Form 10-Q added that "management does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations or cash flows at any given year, as such obligation can be satisfied or settled over many years."  Moreover, the Q2 2017 Form 10-Q stated that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refused to report any amount of liability for the benzene liabilities.

108.     Also August 3, 2017, the Company held an earnings conference call with investors and analysts to discuss its second quarter 2017 financial results.  During the call, defendant Newman stated that there were "year-over-year increases across all key financial metrics" and "significant improvement in profitability," which defendant Vergnano attributed to "the success of our transformation plan."  Defendant Newman added that the Company had further reduced its net leverage ratio to 2.2x on a trailing twelve-month basis, "well below our net leverage target of 3x, including our new debt issuance, [which] demonstrates our significantly improved credit profile."

109.    On November 3, 2017, Chemours filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2017 (the "Q3 2017 Form 10-Q").  The Q3 2017 Form 10-Q reported a total environmental remediation accrual of just $268 million and stated that, "under adverse changes in circumstances, ***although deemed remote***, the potential liability may range up to approximately $510 [million] above the [$268 million] amount accrued[.]"  The Q3 2017 Form 10-Q added that "management does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations or cash flows at any given year, as such obligation can be satisfied or settled over many years."  Moreover, the Q3 2017 Form 10-Q stated that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refused to report any amount of liability for the benzene liabilities.

110.    Also on November 3, 2017, Chemours held an earnings conference call with investors and analysts to discuss its third quarter 2017 financial results.  During the call, defendant Vergnano announced that the Company "had another great quarter" and that "[t]he significant progress we've made over the last couple of years to improve our cash generation and strengthen our balance sheet now affords us greater financial and strategic flexibility."  Defendant Newman added that the Company had further reduced its net leverage ratio to 2x on a trailing twelve-month basis, and that "[w]e're very pleased with the continued improvement in our credit profile as recently recognized in the ratings upgrade from Moody's."  During the question and answer session of the call, defendant Newman again touted Chemours' reduction in net leverage, stating "[w]e had committed to be at 3x in '17" and "[t]oday, we're at 2x. ... [O]bviously [we] continue to have as a key focus a strong balance sheet.  It was recently recognized with the Moody's upgrade."  One securities analyst from Barclays Bank PLC

("Barclays") asked about "[t]he situation down in North Carolina, the GenX. ... What's the status? … [F]rom a headline perspective, what should investors expect?"  In response, defendant Vergnano stated that "we continue to be very transparent and open in working with them through this issue," and that "[w]e do not believe that there [are] health effects of this in the drinking water[.]"  In particular, defendant Vergnano stated:

> I would say that this is a very normal chemical operation.  And we've been working very closely with the regulators both in the state and at the federal level, and we continue to be very transparent and open in working with them through this issue. ... We do not believe that there [are] health effects of this in the drinking water, and we've stated that.  But nonetheless, we stopped the effluent going forward, and we've thought that was a good-faith effort for folks in the community as well as good-faith effort with the regulators that we're dealing with.

111.    On December 1, 2017, the Company held an Investor Day conference call, during which defendant Vergnano announced that the "transformation plan powered tremendous financial improvements in both our earnings and on our balance sheet," and as a result, the Company could "officially declare that our plan is complete and Chemours has been transformed."  In particular, defendant Vergnano stated:

> Our transformation plan powered tremendous financial improvement in both our earnings and on our balance sheet.  We made some bold commitments, and we delivered on those.  Today, we can officially declare that our plan is complete and Chemours has been transformed.  In fact, this afternoon, we'll ring the New York Stock Exchange closing bell to symbolically mark this achievement for ourselves, our investors and our customers.

112.    During the call, defendant Newman touted that "[i]n less than 2.5 years, we have been able to de-lever our balance sheet, reducing our net leverage ratio from north of 6x to approximately 2x today, well below what we contemplated at spin and much faster too." Newman further stated that "[t]his improvement has been recognized by our rating agencies with the recent Moody's and S&P upgrades," resulting in a "strong BB credit profile."  In response to a question from a securities analyst from Bloomberg who asked "[h]ow ... should I think about

the cash spend for environmental issues over the next couple years," defendant Newman stated, among other things, that "[w]e had quite a bit of spend this year related to the Pompton Lakes and we expect that spend to gradually decline over time while of course the reserve will continue to come down as it has since spin.  So I wouldn't expect any significant change in cash spending."

113.    On February 15, 2018, Chemours held an earnings conference call with investors and analysts to discuss its fourth quarter and full year 2017 financial results.  During the call, defendant Vergnano stated, "2017 proved to be the year that we solidified our foundation, *as we successfully completed our Five-Point Transformation Plan*" which "helped us to achieve the impressive financial results that we just reviewed."  Defendant Newman added that "2017 proved to be a great finale to our transformation plan," as the Company had "maturely improved our profitability."  Defendant Newman also stated that Chemours had further reduced its net leverage ratio to 1.8x, "over a full turn less than our original leverage target of 3x," resulting in "strong balance sheet flexibility" that "really supports the objectives that we've laid out for shareholders."

114.    On February 16, 2018, Chemours filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2017 (the "2017 Form 10-K").  The 2017 Form 10-K reported a total environmental remediation accrual of just $253 million, which was actually a significant reduction of close to 10% from the $278 million accrual the Company reported just one year earlier, in its 2016 Form 10-K.  With respect to the reduced accrual, the 2017 Form 10-K stated that it was "*appropriate based on existing facts and circumstances*," and that "under adverse changes in circumstances, although *deemed remote*, the potential liability may range up to approximately $510 million above the [$253 million] amount accrued[.]"  The 2017 Form 10-

K further stated that "management does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations, or cash flows at any given year, as such obligation can be satisfied and settled over many years."  Moreover, the 2017 Form 10-K stated that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refused to report any amount of liability for the benzene liabilities.

115.    On May 4, 2018, Chemours filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2018 (the "Q1 2018 Form 10-Q").  The Q1 2018 Form 10-Q reported a total environmental remediation accrual of just $254 million and stated it was "*appropriate based on existing facts and circumstances*," and that "under adverse changes in circumstances, although *deemed remote*, the potential liability may range up to approximately $510 million above the [$254 million] amount accrued[.]"  The Q1 2018 Form 10-Q added that "management does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations or cash flows at any given year, as such obligation can be satisfied or settled over many years."  Moreover, the Q1 2018 Form 10-Q stated that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refused to report any amount of liability for the benzene liabilities.

116.    Also on May 4, 2018, Chemours held an earnings conference call with investors and analysts to discuss its first quarter 2018 financial results.  During the call, defendant Vergnano stated that the Company had achieved "meaningful improvements across all key financial metrics," and that its "net income and [earnings per share] doubled ... driven by the strength of our business."  Defendant Newman added that the Company now had a "solid balance

sheet position," and that "the strength of our balance sheet" had provided the Company "ample flexibility, which we put to good use during the quarter."

117.    On August 3, 2018, Chemours filed with the SEC its Quarterly Report on Form 10-Q for the period ended June 30, 2018 (the "Q2 2018 Form 10-Q").  The Q2 2018 Form 10-Q reported a total environmental remediation accrual of just $247 million and stated it was "*appropriate based on existing facts and circumstances*," and that "under adverse changes in circumstances, although *deemed remote*, the potential liability may range up to approximately $500 million above the [$247 million] amount accrued[.]"  The Q2 2018 Form 10-Q added that "management does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations or cash flows at any given year, as such obligation can be satisfied or settled over many years."  Moreover, the Q2 2018 Form 10-Q stated that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refused to report any amount of liability for the benzene liabilities.

118.    Also on August 3, 2018, Chemours held an earnings conference call with investors and analysts to discuss its second quarter 2018 financial results.  During the call, defendant Newman stated that "we continue to enhance our liquidity while adding flexibility to [Chemours'] balance sheet," and that the Company "continued to benefit from the flexibility that our balance sheet provides."

119.    On November 2, 2018, Chemours with the SEC filed its Quarterly Report on Form 10-Q for the period ended September 30, 2018 (the "Q3 2018 Form 10-Q").  The Q3 2018 Form 10-Q reported a total environmental remediation accrual of just $239 million and stated it was "*appropriate based on existing facts and circumstances*," and that "under adverse changes

in circumstances, although **deemed remote**, the potential liability may range up to approximately $470 million above the [$239 million] amount accrued[.]"  The Q3 2018 Form 10-Q added that "management does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations or cash flows at any given year, as such obligation can be satisfied or settled over many years."  Moreover, the Q3 2018 Form 10-Q stated that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refused to report any amount of liability for the benzene liabilities.

120.    Also on November 2, 2018, Chemours held an earnings conference call with investors and analysts to discuss its third quarter 2018 financial results.   During the call, defendant Newman touted the "profitability of our business," and stated that the Company had reduced its net leverage ratio again, to 1.5x.  Defendant Newman added that "[w]e continue to believe that our balance sheet affords us ample strategic flexibility in each of our 3 businesses and the ability to manage through any broader economic cycle."

121.    On January 7, 2019, defendant Vergnano gave the keynote address at the Delaware State Chamber of Commerce 182nd Annual Dinner.  Against the backdrop of a slide titled, "Early on, more than a few chattering pundits and prognosticators left Chemours for dead," defendant Vergnano publicly stated that in "no way" had Chemours been "set up to fail." In particular, he stated:

> Not too long into our life as a publicly traded company, a number of business journalists and financial writers left us for dead.  Some proclaim that we were absolutely set up to fail. Chemours was born in the summer of 2015, a spin-off of DuPont's performance chemicals business, as many of you here tonight know. Did we have a tough slog ahead?  You bet.  Were we set up to fail?  No way.

122.    Defendant Vergnano then touted the Company's "transformation" and "turnaround."   In particular, he stressed that Chemours successfully executed a "5-point transformation plan" resulting in a turnaround that was "nothing short of remarkable," including "tripled" adjusted earnings, reduced leverage from "8 times levered to below 2 times levered from a debt perspective," and a shareholder return "of over 127% in the last fiscal year."

123.    On February 15, 2019, Chemours held an earnings conference call with investors and analysts to discuss its fourth quarter and full year 2018 financial results.   During the call, defendant Vergnano touted "[t]he strength of [the Company's] balance sheet," which "affords us the ability to invest in our company while continuing to return significant cash to shareholders through our share repurchase authorization and dividends."   Also, defendant Newman stated that the Company's net leverage ratio continued to be low at approximately 1.6x, and asserted that "[w]e believe that our de-risked balance gives us the ability to execute our strategy through any potential economic cycle, while returning the majority of our free cash flow to shareholders."

124.    On February 15, 2019, Chemours filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 Form 10-K").   The 2018 Form 10-K reported both dramatically reduced accruals and purported "maximum liability" figures. Specifically, the 2018 Form 10-K reported accruals for environmental remediation of only $226 million, a reduction of more than 10% from the $253 million it had accrued in the 2017 Form 10-K, and a reduction of almost 20% form the accrual set forth in its 2016 Form 10-K.   Similarly, the 2018 Form 10-K stated that its "remote" maximum liability above that accrual would only be $450 million, a reduction of almost 12% from the $510 million the Company reported in the 2017 Form 10-K.   The 2018 Form 10-K further stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site

will have a material impact on [the Company's] financial position, results of operations, or cash flows at any given year, as such obligation can be satisfied and settled over many years."   In addition, the 2018 Form 10-K reported a litigation accrual for PFOA of just $22 million, with no litigation accrual at all for other types of PFAS, and stated that, "[W]hile management believes it is reasonably possible that Chemours could incur losses in excess of the amounts accrued, if any, for the [proceedings regarding which Chemours was obligated to indemnify DuPont], it does not believe any such loss would have a material impact on the Company's consolidated financial position, results of operations, or cash flows."   Moreover, the 2018 Form 10-K stated that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refused to report any amount of liability for the benzene liabilities.

125.     On May 3, 2019, Chemours filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2019 (the "Q1 2019 Form 10-Q").  The Q1 2019 Form 10-Q reported a total environmental remediation accrual of just $233 million and stated it was "*appropriate based on existing facts and circumstances*," and that "under adverse changes in circumstances, although *deemed remote*, the potential liability may range up to approximately $450 million above the [$233 million] amount accrued[.]"  The Q1 2019 Form 10-Q added that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on [the Company's] financial position, results of operations or cash flows at any given year, as such obligation can be satisfied or settled over many years."  In addition, the Q1 2019 Form 10-Q reported a litigation accrual for PFOA of just $22 million, with no litigation accrual at all for PFAS, and stated that, "[w]hile management believes it is reasonably possible that Chemours could incur losses in excess of the amounts accrued, if any, for the [proceedings regarding which Chemours was

obligated to indemnify DuPont], it does not believe any such loss would have a material impact on the Company's consolidated financial position, results of operations, or cash flows." Moreover, the Q1 2019 Form 10-Q stated that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refused to report any amount of liability for the benzene liabilities.  It went on to repeat earlier statements regarding GenX, stating that "[t]he Company believes that discharges to the Cape Fear River, site surface water, groundwater, and air emissions have not impacted the safety of drinking water in North Carolina[.]"

126.    The Q1 2019 Form 10-Q also misrepresented Chemours' liability for several lawsuits filed by the New Jersey Department of Environmental Protection in March 2019. Specifically, the Q1 2019 Form 10-Q failed to report any accruals for liabilities relating to these actions, and stated that although a loss was possible, it was "not estimable."  However, as Chemours later admitted, Chemours was aware of estimates by DuPont that its environmental liabilities in New Jersey would be approximately $620 million, a figure that it admitted was, as New Jersey had stated, "implausib[ly] low."

127.    Also on May 3, 2019, Chemours held an earnings conference call with investors and analysts to discuss its first quarter 2019 financial results.  During the call, defendant Newman stated, "[w]ith a strong balance sheet heading into 2019, we were able to opportunistically execute on our share repurchase program, fund the working capital needs of the business and execute strategic investments[.]"

## REASONS THE STATEMENTS WERE IMPROPER

128.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a)     the Company had inherited billions of dollars of known but undisclosed environmental liabilities upon its spin-off from DuPont;

(b)     the Company massively understated accruals for its environmental liabilities;

(c)     the possibility of costs exceeding accrued amounts was not "remote" and indeed material; and

(d)     as a result of the foregoing, the Individual Defendants' representations concerning the Company's financials and financial prospects were improper.

## THE TRUTH BEGINS TO EMERGE

129.    The truth about the Individual Defendants' wrongdoing and misrepresentations began to emerge on May 6, 2019, during the Sohn Investment Conference held in New York, New York.  During the conference, Larry Robbins ("Robbins"), CEO and Portfolio Manager of the hedge fund Glenview Capital Management, gave a detailed presentation during which he revealed information about the true liabilities that Chemours and other chemical manufacturers faced as a result of increasing PFAS litigation exposure.  Specifically, Robbins revealed that Chemours had massively understated its environmental liabilities exposure in its financial statements.  He emphasized that Chemours, DuPont, and other manufacturers of PFAS had known about the contamination of drinking water supplies and the fatal health effects caused by the contamination for decades, but intentionally suppressed that information from the public. Robbins added that Chemours was forced to indemnify DuPont for these liabilities, stating, "the liabilities are now Chemours'.  Every time you see DuPont losing a suit, you should assume that that liability will stay with Chemours."  As a result of his analyses, Robbins revealed that

Chemours faced "$4 to 6 billion" in environmental liabilities, an amount that dwarfed the Company's reserves and represented "60 to 100% of its current market [capitalization]."

130.    On this news, Chemours' market capitalization dropped more than $2.57 per share on May 6, 2019, to close at $31.61 per share compared to the previous trading day's closing of $34.18 per share, erasing more than $421 million in market capitalization in a single trading day.

131.    Following the revelations at the Sohn Investment Conference, the Individual Defendants publicly disputed Robbins' statements and sought to reassure the market about its control over the environmental litigation liabilities.  For example, SunTrust Robinson Humphrey, Inc. ("SunTrust") issued a report on May 15, 2019, reporting that the Company provided "takeaways" from a meeting SunTrust had with Chemours' management "to discuss the company's exposure to PFAS."  According to SunTrust, those takeaways included that: (i) PFOA was previously used by Chemours' former parent company, DuPont, but that "[u]sage was discontinued 3 years before the spin of [Chemours]"; (ii) Chemours' replacement for PFOA, GenX, "is manufactured and recycled at the Fayetteville site in accordance with an EPA consent order"; (iii) the Company saw "limited litigation risk related to GenX, and believes it is adequately reserved for any potential liabilities"; and (iv) Chemours was pursuing litigation regarding the Company's separation agreement with DuPont, but that "lawsuit is unrelated to PFAS."  In light of these reassurances, SunTrust concluded, "[g]iven the lack of specific legal claims against [Chemours] regarding PFAS and the company's proactive stance toward ... eliminating GenX emissions from its facilities, we believe the concerns about PFAS-related liabilities are premature."

132.    Then, on May 13, 2019, Chemours filed its Verified Complaint against DuPont under seal.  On June 28, 2019, the Delaware Court of Chancery ordered the unsealing of the

complaint.  As described herein, the complaint contained a series of surprising admissions by the Company, including that it actually faced nearly inevitable environmental liabilities of approximately $2.5 billion, which was a conservative estimate, and that the Company was insolvent from its inception.  Indeed, Chemours' environmental liabilities assumed from the spin-off were so profound that the Company claimed it was legally insolvent as a matter of "Delaware General Corporation Law, common law and public policy."  Notably, Chemours filed its complaint under seal just one week after the Robbins presentation exposed the Company's vastly understated liabilities and just two days before it denied Robbins' findings to analysts.  In a statement released by the Company following the unsealing of the complaint, Chemours stated:

> Chemours believes the legal action we have taken in Delaware Chancery Court is in the best interest of all Chemours stakeholders.  From its inception, Chemours moved quickly and with urgency to transform the company and take action to address historic issues.  The language in the lawsuit speaks for itself and we will not comment on further pending litigation.

133.    On this news, Chemours' market capitalization fell another $3.73 per share on July 2, 2019, to close at $21.17 per share compared to the previous trading day's closing of $24.90 per share, erasing more than $611 million, or nearly 15%, in market capitalization.

134.    Analysts were stunned by the admissions.  For example, on July 8, 2019, SunTrust issued a report stating that "[w]e are lowering our price target on [Chemours] from $52 to $36 to account for an upwardly revised estimate of potential legacy environmental liabilities stemming from [PFAS]."  The report added that, "[i]n a recent court filing, [Chemours] quantified potential high-end liabilities of approximately $2.5 [billion]," which rendered its exposure "materially higher than expected."  Moreover, the report noted that the $2.5 billion estimate was likely highly conservative and represented only liabilities that the Company had chosen to quantify.  The report estimated that Chemours' "current valuation of 4.1x

2020[estimated] EBITDA assumes exposure of ~$5.5 [billion], or more than 2x the upper end of what [Chemours] has been able to estimate."

135.    Finally, on August 1, 2019, the Company issued a press release announcing its second quarter 2019 financial results and lowering its full-year guidance.   Specifically, Chemours drastically reduced its full-year free cash flow outlook from $550 million to just $100 million, indicating that, rather than a "strong" balance sheet with ample room to deal with future liabilities, the Company had virtually no liquidity cushion.  In its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2019, filed with the SEC on August 2, 2019, Chemours further disclosed significant increases in its estimated environmental liabilities, including over a dozen new legal and regulatory actions related to PFAS.

136.    On this news, Chemours' market capitalization plummeted another $3.47 per share on August 2, 2019, to close at $14.69 per share compared to the previous trading day's closing of $18.16 per share, erasing another $567 million, or 19%, in market capitalization.

137.    Analysts again reacted negatively to Chemours' disclosures and specifically tied the Company's poor financial results to its environmental liabilities.  For instance, on August 1, 2019, Barclays issued a report stating that the financial results had been heavily impacted by Chemours' rising liabilities, and noted that PFAS liability was the "more significant issue in our mind," and "the only credible risk to [Chemours'] intrinsic value."  Similarly, SunTrust issued a report on August 5, 2019, downgrading Chemours' stock from "buy" to "hold" and cutting its target price by more than half from $36 to $16 per share, due to "worst case environmental liability scenarios as accruals for remediation and litigation continue to rise."  SunTrust further stated that the Verified Complaint against DuPont had "detail[ed] materially higher potential exposures under multiple lawsuits since the spin," amount to "~$2.5 [billion] of maximum

liability" even after the Ohio MDL settlement and with "several active legal cases" still pending. The SunTrust report further noted that "investors are likely to presume that max environmental liabilities are roughly equivalent to the $4 [billion] dividend paid to DuPont, which [Chemours] seeks to recoup in its lawsuit."  Also on August 5, 2019, Barclays issued a report stating that "PFAS liability" represented a "significant liability" for Chemours, adding that "we believe the market will continue to discount ~$2.5 [billion] [for environmental liabilities] for the foreseeable future."  Lastly, on August 9, 2019, RBC Capital Markets, LLC issued a report downgrading Chemours stock from "Outperform" to "Sector Perform," adding that PFAS liability could be "[w]orse than expected."

138.    The Individual Defendants' wrongdoing continues to have a devastating impact on the Company to this day.  Several analysts have since questioned the viability of the Company and actually anticipate true liabilities in the hundreds of billions of dollars.  For example, one Bloomberg article issued on November 4, 2019, reported that Chemours "may have to pay out more than $160 billion over the next two to three decades, with roughly half of that coming from environmental remediation," over sixty-seven times its current market capitalization.  Another SunTrust report issued on November 5, 2019, noted the "continued uncertainty around [Chemours'] environmental liabilities."  Furthermore, the Company faces additional litigation, federal legislation, PFAS-related federal and state investigations, and a potential criminal investigation from the U.S. Department of Justice.  Accordingly, the fallout from the Individual Defendants' wrongdoing has devastated the Company, which has suffered and will continue to suffer substantial damages.

139.    Chemours is now the subject of a consolidated federal securities class action lawsuit filed in the U.S. District Court for the District of Delaware on behalf of investors who

purchased Chemours stock. The securities class action seeks claims against the Company, defendant Vergnano, and defendant Newman in connection with the Company's improper statements and fraudulent scheme to deceive the investing public, including causes of action under sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## THE FALSE AND MISLEADING 2019 PROXY

140.     Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

141.     On March 14, 2019, defendants Anastasio, Bell, Brown, Cranston, Crawford, Farrell, Keohane, and Vergnano caused Chemours to file with the SEC its 2019 Proxy in connection with the 2019 Annual Meeting of Shareholders, which was held on April 30, 2019. In the 2019 Proxy, defendants Anastasio, Bell, Brown, Cranston, Crawford, Farrell, Keohane, and Vergnano solicited stockholder votes to, among other things: (i) reelect themselves to the Board; and (ii) reject a stockholder proposal demanding the Board prepare a report to be made available to stockholders that shall review the compensation packages provided to the Company's executives.

142.     In support of defendants Anastasio, Bell, Brown, Cranston, Crawford, Farrell, Keohane, and Vergnano's bid to reelect themselves to the Board, the 2019 Proxy claimed that the Audit Committee "assists the Board of Directors in oversight of the Company's compliance with

legal and regulatory requirements.  In fulfilling this role, the Audit Committee reviews ... any legal matters that may have a material impact on the Company's financial statements."  The 2019 Proxy also claimed that "[t]he Board is committed to the highest standards of corporate governance, which is essential for sustained success and long-term shareholder value," and incorporated the Company's Corporate Governance Guidelines and Code.

143.    The statements of defendants Anastasio, Bell, Brown, Cranston, Crawford, Farrell, Keohane, and Vergnano misleadingly claimed that the Board: (i) maintained sufficient compliance, internal control, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; and (iii) maintained risk management practices.  The 2019 Proxy omitted any disclosures that: (i) the Company had inherited billions of dollars of known but undisclosed environmental liabilities upon its spin-off from DuPont; (ii) the Company massively understated accruals for its environmental liabilities; (iii) the possibility of costs exceeding accrued amounts was not "remote" and indeed material; and (iv) as a result of the foregoing, the Individual Defendants' representations concerning the Company's business operations, financials, and financial prospects were improper when made. The Board and Audit Committee did not exercise active and appropriate oversight over the Company's risk management and financial statements.  Defendants Anastasio, Bell, Brown, Cranston, Crawford, Farrell, Keohane, and Vergnano were negligent in including these misleading statements in the 2019 Proxy.

144.    The 2019 Proxy harmed Chemours by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  As a result of the defendants' misleading statements in the 2019 Proxy, Chemours'

stockholders voted to reelect defendants Anastasio, Bell, Brown, Cranston, Crawford, Farrell, Keohane, and Vergnano.

145.   In addition, the 2019 Proxy contained a stockholder proposal, Proposal 4, demanding the Board to prepare a report to be made available to stockholders that shall review the compensation packages provided to the Company's executives.   Under Proposal 4, the stockholders noted that although nonemployee members of the Board receive annual compensation from $230,000 to $340,000, "it does not appear that these members of the Board are required to attend any meetings or even participate in conference calls.   Nor is it clear precisely what work, if any, is actually performed by any individual member of the Board."   Given this generous compensation, the stockholders questioned whether the approval of "extraordinarily generous compensation ranging from $2.1 million to $9.9 million for senior executives" was just "'one hand washing the other.'"   In particular, Proposal 4 stated:

> **RESOLVED:** That the stockholders of The Chemours Company, assembled in annual meeting in person and by proxy, hereby recommend the following nonbinding proposal:
>
> That the Board of Directors prepare a report, to be made available to shareholders four months after the 2019 Annual Meeting, that shall review the compensation packages provided to senior executives of the Company and address the following.
>
> 1. Comparison of compensation packages for senior executives with that provided to the lowest paid Company employees.
>
> 2. Whether there should be a ceiling on compensation provided to senior executives so as to prevent the possibility of excessive compensation.
>
> 3. Whether compensation of senior executives should be adjusted in a situation where there is a stated need for employees to be laid off from work.
>
> ### Stockholders' Statement
>
> Pay for senior executives of Chemours is determined by its Board of Directors. According to the March 2018 proxy statement, non-employee members of the

Board receive annual compensation ranging from $230,000 to $340,000 for their service on the Board.

Yet it does not appear that these members of the Board are required to attend any meetings or even participate in conference calls. Nor is it clear precisely what work, if any, is actually performed by any individual member of the Board. All that is said is that each director attended at least 75% of the Board meetings and meetings of the Committees on which they served.

Given this extraordinarily generous compensation provided to the members of the Board, is it any surprise that these same members have approved extraordinarily generous compensation ranging from $2.1 million to $9.9 million for senior executives of Chemours? Can we just view this back and forth between the Board and senior executives as simply that of "one hand washing the other"?

Not surprisingly, virtually nothing is said in the proxy statement regarding how the employees of Chemours — those who are not executives — are compensated. This failure is no surprise given that employees have been granted the most minimal of wage increases and have experienced the Company eliminating its 3% contribution to each employee's savings and investment plan.

This proposal seeks to have the Board address these issues of compensation, issues involving not just the compensation of executives, but also how the executives are compensated in relation to how its non-executive employees are compensated.

146.    The Board recommended that stockholders vote *against* Proposal 4.  In support of their recommendation, the Board asserted that its executive compensation philosophy "supports long-term shareholder value and drives fairness and consistency across the Company," and that its executive compensation program and pay-for-performance philosophy is "carefully designed."  The Board highlighted the Company's "Corporate Governance Guidelines and the various Board Committee charters."  In particular, supplying the reasoning for stockholders to vote against Proposal 4, the 2019 Proxy stated:

**Chemours' executive compensation philosophy supports long-term shareholder value and drives fairness and consistency across the Company.**

Our employees have a wide range of responsibilities, and we believe that all of our employees make contributions that are important to our success. We are committed to paying our employees fairly in accordance with their job

responsibilities, their performance in those jobs and their ability to contribute to our overall success, taking into account competitive and market factors.

Within this overall framework, compensation for employees at different levels within Chemours is determined based on different factors. As discussed in more detail under "Executive Compensation Philosophy and Pay-for-Performance" in this Proxy Statement, the executive compensation framework for Named Executive Officers (NEOs) is purposely different from that for other employees, as NEOs realize the greatest rewards through the achievement of corporate objectives. This approach aligns the pay outcomes of executives with company performance and shareholder interests. Exemplifying the strong link between NEO pay and company performance, for fiscal year 2018, 87% of the CEO's target compensation and 71% of the other NEOs' target compensation, on average, was variable based on the achievement of performance measures. Accordingly, the total compensation program for senior executives emphasizes at-risk incentive pay and, therefore, fluctuates with financial results and stock price, whereas other employees may experience less volatility in compensation.

The proposal suggests that a disparity between NEO pay and the pay to other Company employees may indicate that management has undue influence on the Board. Chemours has established governance processes that are reflected in the Company's Corporate Governance Guidelines and the various Board Committee charters, including policies and processes designed to ensure the independence of Chemours' non-employee directors. These policies and charters are available on the Chemours website at https://investors.chemours.com/corporate-governance /default.aspx. In addition, in accordance with the expectations set forth in the Corporate Governance Guidelines, all directors attended over 75% of the Board meetings and meetings of the Committees on which they served. A description of the Board's corporate governance practices and each Committee's responsibilities may be found under "Corporate Governance" and "Board Structure and Committee Composition" in this Proxy Statement.

Our Compensation and Leadership Development Committee has responsibility for overseeing Chemours' executive compensation programs and for approving the compensation of the NEOs, and in regards to our CEO, recommends CEO compensation to our Board for approval. Accordingly, the Compensation and Leadership Development Committee is best positioned to determine what factors should be considered when making decisions on executive pay and to implement executive compensation practices that are aligned with the interests of our shareholders and our pay-for-performance philosophy. The Compensation and Leadership Development Committee has developed a compensation program for NEOs that it believes best serves shareholder interests and which has received support from shareholders, as described below.

**Chemours' executive compensation program and pay-for-performance philosophy is carefully designed to attract, retain and motivate executive talent.**

Chemours competes for executive talent and must provide competitive compensation and benefits to attract and retain talented employees, as well as to reward for strong business and financial results. As discussed in more detail under "Executive Compensation Philosophy and Pay-for-Performance" in this Proxy Statement, Chemours' executive compensation programs currently reward high-performing executive talent for sustained, strong business and financial results. Chemours believes that adoption of the review and report requested by the proponent does not serve to enhance a compensation decision-making process that is focused on the enhancement of long-term shareholder value, taking into account best practices, market competitiveness and the Company's strategic, operational and financial goals. Implementation of the proposal may ultimately result in loss of executive talent or significantly hinder the Company's ability to be competitive in the global market for talent.

147.   The Board's statement in opposition of Proposal 4 called attention to various sections of the 2019 Proxy, including the "Board Structure and Committee Composition" and "Executive Compensation Philosophy and Pay-for-Performance" sections.   These sections emphasized the Company's "2018 Business Highlights," which showed improvements across the board in 2018 over the prior year.  In particular, the 2019 Proxy stated:

**2018 Business Highlights**

Chemours' results from operations for the year ended December 31, 2018 include positive contributions from all three segments. Net sales increased to $6.6 billion for the year ended December 31, 2018 compared with $6.2 billion for the same period in 2017, primarily attributable to higher average selling prices for our Ti-Pure™ TiO2 pigment in the Titanium Technologies segment, increased adoption of Opteon™ refrigerants and higher average price for fluoropolymer products in the Fluoroproducts segment, and increased price across all businesses in the Chemical Solutions segment. GAAP Net Income increased to $995 million and adjusted earnings before interest, income taxes, depreciation, and amortization ("Adjusted EBITDA") increased to $1.7 billion for the year ended December 31, 2018. These increases were primarily attributable to the aforementioned increases in pricing and volume, partially offset by higher distribution and raw material costs in 2018.

2018 highlights include:

- Net sales of $6.6 billion, up 7% versus 2017

- GAAP Net income of $995 million, up 33% versus 2017

- Adjusted EBITDA of $1.7 billion, up 22% versus 2017

- Improved cash flow from operations of $1.1 billion, up $500 million versus 2017

Adjusted EBITDA is a non-GAAP financial measure. Please refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations—Non-GAAP Financial Measures" starting on page 56 of the Company's Annual Report on Form 10-K for the year ended December 31, 2018 for a reconciliation of Adjusted EBITDA to the most directly comparable GAAP measure.

148.    In discussing executive pay-per-performance measures, the 2019 Proxy stated that "[t]o reinforce Chemours' pay-for-performance philosophy, the total compensation program for executives emphasizes at-risk incentive pay and, therefore, fluctuates with financial results and stock price."  In total, 87% of the CEO's pay elements were incentive based, and 71% of other named executive officers' pay elements were incentive based.  One significant factor of the CEO's 2018 performance-based pay was his "[c]ompletion of Chemours' Transformation Plan."

149.    Notably, the 2019 Proxy stated that the Company's adjusted EBITDA and free cash flow determined *100%* of the pay-per-performance measures.  It touted the Company's 2018 adjusted EBITDA and free cash flow, as reported in the 2018 Form 10-K.  As described herein, these two financial measures were false as reported because Chemours had understated (by at least $2.5 billion) its inherited environmental liabilities, liabilities that directly impacted both adjusted EBITDA and free cash flow.  Thus, the statements in 2019 Proxy regarding executive pay-per-performance were false and misleading because the executive pay philosophy relied

entirely on misreported financial measures, and therefore the large majority of executive payouts were not warranted.

150.     As a result of these misleading statements, the Company's stockholders voted against Proposal 4 without adequate information necessary to make a reasonably informed decision.

## THE INDIVIDUAL DEFENDANTS CAUSED CHEMOURS TO REPURCHASE ITS OWN STOCK AT INFLATED PRICES

151.     In breach of their fiduciary duties to Chemours, and in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5, defendants Vergnano, Newman, Brown, Anastasio, Bell, Cranston, Crawford, Farrell, Keohane, Kane, and Newlin, caused or approved of the Company's repurchase of over twenty-five million shares of its stock at artificially inflated prices.

152.     Throughout the relevant period, the Board approved repurchases of the Company's common stock at artificially inflated prices that substantially damaged Chemours.  In particular, the Board approved new stock repurchase plans: (i) on November 30, 2017, for up to $500 million for the following six months; (ii) on August 1, 2018, for up to $750 million for the following six months; and (iii) on February 13, 2019, for up to $1 billion for the following six months.

153.     In total, the Company spent an aggregate amount of over $1 billion to repurchase 25,331,646 shares of its own common stock at artificially inflated prices from December 2017 to May 2019, as shown by the table below:

| Date of Board Authorization Repurchase Program | Authorized Amount of Repurchase | Period | Repurchased Shares | Average Price Per Share | Weighted Average Calculation | Approximate Aggregate Cost |
|---|---|---|---|---|---|---|
| November 30, 2017 | 500 Million | | | | | |
| | | Dec-17 | 2,386,406 | $48.81 | $4.60 | $116,480,477 |
| | | Jan-18 | 654,241 | $51.23 | $1.32 | $33,516,766 |
| | | Feb-18 | 1,124,196 | $50.06 | $2.22 | $56,277,252 |
| | | Mar-18 | 3,200,715 | $48.44 | $6.12 | $155,042,635 |
| | | Apr-18 | 764,786 | $50.58 | $1.53 | $38,682,876 |
| | | May-18 | 1,955,303 | $51.14 | $3.95 | $99,994,195 |
| | | Jun-18 | - | - | - | - |
| | | Jul-18 | - | - | - | - |
| August 1, 2018 | 750 Million | | | | | |
| | | Aug-18 | 1,161,655 | $44.75 | $2.05 | $51,984,061 |
| | | Sep-18 | 2,065,169 | $40.81 | $3.33 | $84,279,547 |
| | | Oct-18 | 3,124,033 | $36.30 | $4.48 | $113,402,398 |
| | | Nov-18 | - | - | - | - |
| | | Dec-18 | - | - | - | - |
| | | Jan-19 | 3,198,563 | $33.33 | $4.21 | $106,608,105 |
| | | Feb-19 | 2,202,448 | $37.86 | $3.29 | $83,384,681 |
| February 13, 2019 | 1 Billion | | | | | |
| | | Mar-19 | 1,876,991 | $37.86 | $2.81 | $71,068,510 |
| | | Apr-19 | 1,387,241 | $38.51 | $2.11 | $53,422,651 |
| | | May-19 | 229,899 | $34.44 | $0.31 | $7,917,722 |
| **Total:** | | | **25,331,646** | | **$42.32** | **$1,072,061,876** |

154. Through the repurchases, the Director Defendants signaled to the market that they believed Chemours' shares were undervalued and that the repurchases were the best use of the Company's cash. Because share repurchases lower the number of outstanding shares, the repurchases also increased the Company's earnings per share, return on equity, return on assets, and other metrics. Collectively, these actions artificially inflated Chemours' share price with each repurchase, and increased the price for each subsequent repurchase.

155. When the truth about the Company's true environmental liabilities was fully exposed, Chemours stock price fell to approximately $14.69 per share. As a result, the 25,331,646 shares the Company repurchased between December 2017 and May 2019 for over $1

billion were only worth approximately $372 million, or only 34.71%, of what the Company paid for them.

## INSIDER SALES BY DEFENDANTS VERGNANO AND NEWMAN

156.    Rather than providing the market with correct information, the Insider Selling Defendants, defendants Vergnano and Newman, used their knowledge of Chemours' material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated.  As officers and directors of Chemours, the Insider Selling Defendants were privy to material, nonpublic information about the Company's true business health.

157.    While in possession of this knowledge, defendant Vergnano sold 200,151 shares of his personally held Chemours stock for proceeds of $10 million.  Defendant Vergnano's sales were timed to maximize profit from Chemours' then artificially inflated stock price.  Defendant Vergnano's sales are suspicious given that his stock sales represented 15.6% of his holdings as demonstrated by the table below:

| | |
|---|---:|
| Total Shares Before Sales | 395,872 |
| Shares Sold During Sales Period ("SP") | 200,151 |
| Shares Disposed (Other) During SP | 392,422 |
| Total Shares Held During SP | 1,282,827 |
| Shares Remaining SP | 690,254 |
| **Total Proceeds from Sales** | **$10,101,600.18** |
| **% of Total Ownership Sold During SP** | **15.60%** |

158.    While in possession of this knowledge, defendant Newman sold 155,047 shares of his personally held Chemours stock for proceeds of $6.8 million.  Defendant Newman's sales were timed to maximize profit from Chemours' then artificially inflated stock price.  Defendant Newman's sales are suspicious given that his stock sales represented 39% of his holdings as demonstrated by the table below:

| | |
|---|---:|
| Total Shares Before Sales | 159,351 |
| Shares Sold During Sales Period ("SP") | 155,047 |
| Shares Disposed (Other) During SP | 145,710 |

| | |
|---|---|
| Total Shares Held During SP | 397,498 |
| Shares Remaining SP | 96,741 |
| **Total Proceeds from Sales** | **$6,803,519.74** |
| **% of Total Ownership Sold During SP** | **39.01%** |

159.    In sum, defendants Vergnano and Newman sold almost $17 million worth of stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **VERGNANO** **Current Chief Executive Officer, President, and Director** | 5/8/2018 | 144,438 | $50.52 | $7,297,007.76 |
| | 5/9/2018 | 55,713 | $50.34 | $2,804,592.42 |
| | | **200,151** | **Total (Sales)** | **$10,101,600.18** |
| | | | | |
| **NEWMAN** **Current Chief Operating Officer** | 5/4/2017 | 22,431 | $39.82 | $893,202.42 |
| | 5/5/2017 | 350 | $40.79 | $14,276.50 |
| | 3/9/2018 | 17,281 | $49.24 | $850,906.07 |
| | 3/9/2018 | 10,600 | $49.13 | $520,820.40 |
| | 3/9/2018 | 800 | $49.05 | $39,236.00 |
| | 3/9/2018 | 700 | $49.00 | $34,300.00 |
| | 5/8/2018 | 40,000 | $50.00 | $2,000,000.00 |
| | 5/8/2018 | 3,675 | $50.45 | $185,403.75 |
| | 3/11/2019 | 59,210 | $38.26 | $2,265,374.60 |
| | | **155,047** | **Total (Sales)** | **$6,803,519.74** |
| | | | | |
| | | | | |
| | | **355,198** | **Total (Sales)** | **$16,905,119.92** |

## DAMAGES TO CHEMOURS

160.    As a result of the Individual Defendants' improprieties, Chemours disseminated improper, public statements concerning the Company's true environmental liabilities.   These improper statements have devastated Chemours' credibility as reflected by the Company's $9 billion, or 88.77%, market capitalization loss.

161.    Chemours' performance issues also damaged its reputation within the business community and in the capital markets.   In addition to price, Chemours' current and potential customers consider a company's ability to accurately value its business prospects and evaluate its liabilities.   Businesses are less likely to award contracts to companies that are uncertain about

their own financial conditions.  Chemours' ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

162.   Further, as a direct and proximate result of the Individual Defendants' actions, Chemours has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)   costs incurred from defending and paying any settlement in the class action for violations of federal securities laws;

(b)   excessive sums paid to repurchase the Company's stock at inflated prices;

(c)   costs incurred to investigate wrongdoing; and

(d)   costs incurred from compensation and benefits paid to the defendants who have breached their duties to Chemours.

163.   In addition, since the Insider Selling Defendants utilized the Company's nonpublic information to sell their stock, they must disgorge any profits from these sales back to Chemours.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

164.   Plaintiff brings this action derivatively in the right and for the benefit of Chemours to redress injuries suffered, and to be suffered, by Chemours as a direct result of violations of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Chemours is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

165.    Plaintiff will adequately and fairly represent the interests of Chemours in enforcing and prosecuting its rights.

166.    Plaintiff was a stockholder of Chemours at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Chemours stockholder.

167.    The current Board of Chemours consists of the following nine individuals: defendants Brown, Vergnano, Anastasio, Bell, Cranston, Crawford, Farrell, Kane, and Keohane. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Their Misconduct**

168.    As alleged above, defendants Brown, Vergnano, Anastasio, Bell, Cranston, Crawford, Farrell, Kane, and Keohane (the entire Board) directly made the improper statements in the Company's press releases and SEC filings.  These defendants knew or were reckless in not knowing that: (i) the Company had inherited billions of dollars of known but undisclosed environmental liabilities upon its spin-off from DuPont; (ii) the Company massively understated accruals for its environmental liabilities; (iii) the possibility of costs exceeding accrued amounts was not "remote" and indeed material; and (iv) as a result, the Company's Individual Defendants' representations concerning the Company's business operations and financial prospects were improper when made.

169.    Defendants Anastasio, Bell, Cranston, Crawford, and Kane, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance.  The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  Thus, the Audit Committee Defendants were responsible for

knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

170.    Defendants Vergnano, Brown, Anastasio, Bell, Cranston, Crawford, Farrell, and Keohane are responsible for the negligently made statements in the materially misleading 2019 Proxy.  It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act.  An indemnification provided by the Company to defendants Vergnano, Brown, Anastasio, Bell, Cranston, Crawford, Farrell, and Keohane does not protect them for violations of section 14(a) in the 2019 Proxy.  Accordingly, defendants Vergnano, Brown, Anastasio, Bell, Cranston, Crawford, Farrell, and Keohane face a substantial likelihood of liability, excusing demand.

171.    Defendants Brown, Vergnano, Anastasio, Bell, Cranston, Crawford, Farrell, Kane, and Keohane face a substantial likelihood of liability for violations of section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder for causing Chemours to repurchase over $1 billion in shares of its own common stock at prices that were artificially inflated due to the Individual Defendants' false or misleading statements.

172.    The principal professional occupation of defendant Vergnano is his employment with Chemours, pursuant to which he has received and continues to receive substantial monetary

compensation and other benefits as alleged above.  Accordingly, defendant Vergnano lacks independence from defendants Brown, Anastasio, Bell, Cranston, Crawford, Farrell, Kane, and Keohane due to his interest in maintaining his executive position at Chemours.  This lack of independence renders defendant Vergnano incapable of impartially considering a demand to commence and vigorously prosecute this action.  Chemours paid defendant Vergnano the following compensation:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan | Change in Pension Value and Nonqualified and Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|--------------|---------------|---------------------------|------------------------------------------------------------------------------|------------------------|-------|
| 2019 | $1,029,808 | $4,273,767 | $2,239,992 | - | - | $152,077 | $7,695,644 |
| 2018 | $1,041,667 | $3,559,120 | $2,199,980 | $1,000,545 | - | $275,417 | $8,076,729 |
| 2017 | $983,333 | $3,787,623 | $2,199,989 | $2,600,000 | $141,163 | $232,063 | $9,944,171 |

Accordingly, defendant Vergnano is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation.

173.   Defendant Vergnano also sold Chemours stock under highly suspicious circumstances.  Defendant Vergnano, as President, CEO and a Board director, possessed material, nonpublic Company information and used that information to benefit himself. Defendant Vergnano sold stock based on this knowledge of material, nonpublic Company information regarding the Company's massive, undisclosed inherited environmental  liabilities and the impending decrease in the value of their holdings of Chemours.  Accordingly, defendant Vergnano faces a substantial likelihood of liability for breach of his fiduciary duty of loyalty. Any demand upon defendant Vergnano is futile.

174.   Any suit by the current directors of Chemours to remedy these wrongs would expose defendants Vergnano, Newman, and Chemours to liability for violations of the federal

securities laws in the pending consolidated securities class action, and would result in civil actions being filed against one or more of the other Individual Defendants.  The securities class action alleges violations of sections 10(b) and 20(a) of the Exchange Act.  If the Board elects for the Company to press forward with its right of action against defendants Vergnano and Newman in this action, then Chemours' efforts would compromise its defense of the securities class action. Accordingly, demand on the Board is excused.

175.    Plaintiff has not made any demand on the other stockholders of Chemours to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Chemours is a publicly held company with over 164 million shares outstanding and thousands of stockholders as of May 1, 2020;

(b)    making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against the Individual Defendants for Violation of Section 10(b) of the Exchange Act**

176.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

177.    During the period of wrongdoing, the Individual Defendants disseminated or approved false or misleading statements about Chemours, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.

Those false or misleading statements and the Individual Defendants' course of conduct artificially inflated the price of Company's common stock.

178.    At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by the Individual Defendants, they caused the Company to repurchase shares of its own common stock at prices that were artificially inflated due to their false or misleading statements.  The Individual Defendants engaged in a scheme to defraud Chemours by causing the Company to repurchase $1 billion in shares of its stock at artificially inflated prices.

179.    The Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Chemours in connection with the Company's purchases of its stock during the period of wrongdoing.

180.    The Individual Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices and artifices to defraud in connection with the purchase and sale of Chemours stock, which were intended to,

and did: (a) deceive Chemours and its stockholders regarding, among other things, the Company's operations and financial prospects; (b) artificially inflate and maintain the market price of Chemours stock; and (c) cause Chemours to purchase its stock at artificially inflated prices and suffer losses when the true facts became known.   Throughout the period of wrongdoing, the Individual Defendants were in possession of material, nonpublic information regarding the above.

181.    The Individual Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the period of wrongdoing, as alleged above.

182.    As described above, the Individual Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.   The misstatements and omissions of material facts set forth in this complaint were either known to the Individual Defendants or were so obvious that they should have been aware of them.   Throughout the period of wrongdoing, the Individual Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

183.    The Individual Defendants' false or misleading statements and omissions were made in connection with the purchase of the Company's stock by the Company itself.

184.    As a result of the Individual Defendants' misconduct, Chemours has and will suffer damages in that it paid artificially inflated prices for its own common stock and suffered losses when the previously undisclosed facts relating to the wrongdoing was disclosed.

185.    Chemours would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Individual Defendants' false or misleading statements.

186.    By reason of the Individual Defendants' wrongful conduct, they are liable to the Company pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5.

187.    Plaintiff brings this claim within two years of her discovery of the facts constituting the violation and within five years of the violation.

## COUNT II

**Against Defendants Vergnano, Brown, Anastasio, Bell, Cranston, Crawford, Farrell, and Keohane for Violation of Section 14(a) of the Exchange Act**

188.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein except for those allegations concerning fraud.

189.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any reckless or knowing conduct by or on behalf of defendants Vergnano, Brown, Anastasio, Bell, Cranston, Crawford, Farrell, and Keohane.  The section 14(a) claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

190.    Defendants Vergnano, Brown, Anastasio, Bell, Cranston, Crawford, Farrell, and Keohane negligently issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to stockholders that were contained in the 2019 Proxy. The 2019 Proxy contained a proposal to the Company's stockholders that they vote to reelect the members of the Board.  The 2019 Proxy, however, misrepresented and failed to disclose and explain that: (i) the Company had inherited billions of dollars of known but undisclosed

environmental liabilities upon its spin-off from DuPont; (ii) the Company massively understated accruals for its environmental liabilities; (iii) the possibility of costs exceeding accrued amounts was not "remote" and indeed material; and (iv) as a result of the foregoing, the Individual Defendants' representations concerning the Company's business operations and financial prospects were improper when made.

191.    The 2019 Proxy also contained a stockholder proposal demanding the Board to prepare a report to be made available to stockholders that shall review the compensation packages provided to the Company's executives.  In the Board's recommendation to vote against this proposal, however, the 2019 Proxy failed to disclose that Chemours' executive pay philosophy relied entirely on misreported financial measures, and therefore the large majority of executive payouts were not warranted.  In truth, defendants Vergnano, Brown, Anastasio, Bell, Cranston, Crawford, Farrell, and Keohane misrepresented and failed to disclose that: (i) the Company had inherited billions of dollars of known but undisclosed environmental liabilities upon its spin-off from DuPont; (ii) the Company massively understated accruals for its environmental liabilities; (iii) the possibility of costs exceeding accrued amounts was not "remote" and indeed material; and (iv) as a result of the foregoing, the Individual Defendants' representations concerning the Company's business operations and financial prospects were improper when made.

192.    By reasons of the conduct alleged herein, defendants Vergnano, Brown, Anastasio, Bell, Cranston, Crawford, Farrell, and Keohane violated section 14(a) of the Exchange Act.  As a direct and proximate result of these violations, stockholders voted in favor of reelecting defendants Vergnano, Brown, Anastasio, Bell, Cranston, Crawford, Farrell, and Keohane to the Board.  Defendants Vergnano, Brown, Anastasio, Bell, Cranston, Crawford,

Farrell, and Keohane's reelection led to the continuation of the wrongful actions described herein. In addition, as a direct and proximate result of these violations, stockholders voted against the stockholder proposal demanding the Board to prepare a report to be made available to stockholders that shall review the compensation packages provided to the Company's executives.

193. Plaintiff, on behalf of Chemours, thereby seeks relief for damages inflicted upon the Company in connection with the improper election of defendants Vergnano, Brown, Anastasio, Bell, Cranston, Crawford, Farrell, and Keohane, as well as the improper executive payouts, based upon the false and misleading 2019 Proxy, and also seeks new director elections on the basis of a special proxy with appropriate corrective disclosures.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duty

194. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

195. The Individual Defendants owed and owe Chemours fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Chemours the highest obligation of care and loyalty.

196. The Individual Defendants and each of them, violated and breached their fiduciary duties.

197. The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration. The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) the Company had inherited billions of dollars of known but undisclosed environmental liabilities upon its spin-off from DuPont; (ii) the Company massively understated accruals for its

environmental liabilities; (iii) the possibility of costs exceeding accrued amounts was not "remote" and indeed material; and (iv) as a result of the foregoing, the Individual Defendants representations concerning the Company's business operations and financial prospects were improper when made.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

198.    The Director Defendants, as directors of the Company, owed Chemours the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper statements concerning Chemours' business and financials, and authorizing the repurchases of Chemours stock at artificially inflated prices.  The Director Defendants knew or were reckless in not knowing that: (i) the Company had inherited billions of dollars of known but undisclosed environmental liabilities upon its spin-off from DuPont; (ii) the Company massively understated accruals for its environmental liabilities; (iii) the possibility of costs exceeding accrued amounts was not "remote" and indeed material; and (iv) as a result of the foregoing, the Individual Defendants' representations concerning the Company's business operations, financials, and financial prospects were improper when made.  Accordingly, the Director Defendants breached their duty of loyalty to the Company.

199.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

200.   The Insider Selling Defendants breached their duty of loyalty by selling Chemours stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders.  The information described above was material, nonpublic information concerning the Company's future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Chemours common stock.

201.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Chemours has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

202.   Plaintiff, on behalf of Chemours, has no adequate remedy at law.

### COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

203.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

204.   As a result of the Individual Defendants' failure to properly supervise and monitor the adequacy of Chemours' disclosure controls and procedures, the Individual Defendants have caused Chemours to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

205.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

206.   Plaintiff, on behalf of Chemours, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Unjust Enrichment

207.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

208.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Chemours.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Chemours.

209.    The Insider Selling Defendants sold Chemours stock while in possession of material, nonpublic information that artificially inflated the price of Chemours' stock.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

210.    Plaintiff, as a stockholder and representative of Chemours, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

211.    Plaintiff, on behalf of Chemours, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Chemours, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violations of securities law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing Chemours to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Chemours and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's oversight of its environmental liability accruals;

2.      a proposal to strengthen the Company's oversight of stock repurchases;

3.      a provision to control insider selling;

4.      a proposal to strengthen the Company's controls over financial reporting and disclosure controls;

5.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

6.      a provision to permit the stockholders of Chemours to nominate at least three candidates for election to the Board; and

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Chemours has an effective remedy;

D.      Awarding to Chemours restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  July 27, 2020

COOCH AND TAYLOR, P.A.

/s/Blake A. Bennett
Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange St., Suite 1120
Wilmington, DE 19801
Telephone: (302) 984-3800
Facsimile: (302) 984-3939
E-mail: bbennett@coochtaylor.com

OF COUNSEL:

*Attorneys for Plaintiff*

ROBBINS LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
ERIC M. CARRINO
EMILY R. BISHOP
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
         csmith@robbinsllp.com
         ecarrino@robbinsllp.com
         ebishop@robbinsllp.com